EVAN FINKEL (SBN 100673)
evan.finkel@pillsburylaw.com
MICHAEL S. HORIKAWA (SBN 267014)
michael.horikawa@pillsburylaw.com
CHAZ M. HALES (SBN 324321)
chaz.hales@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:  213.488.7100
Facsimile:   213.629.1033

CALLIE A. BJURSTROM (SBN 137816)
callie.bjurstrom@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone:  619.544.3107
Facsimile:   619.236.1995

Attorneys for Plaintiff
MICROVENTION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICROVENTION, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BALT USA, LLC, a Delaware Limited Liability Company; DAVID FERRERA; NGUYEN "JAKE" LE; YOSHITAKA KATAYAMA; AND STEPHANIE GONG,<br><br>Defendants. | Case No.  8:20-cv-02400<br><br>PLAINTIFF MICROVENTION, INC.'S COMPLAINT FOR: (1) MISAPPROPRIATION OF TRADE SECRETS UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. §1836 *ET SEQ.*; AND (2) MISAPPROPRIATION OF TRADE SECRETS UNDER CAL. UNIFORM TRADE SECRETS ACT, CAL. CIV. CODE §3426, *ET SEQ.*<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff MicroVention, Inc. ("MicroVention"), by and through its attorneys, brings this Complaint against Defendants Balt USA, LLC ("Balt"), David Ferrera, Nguyen "Jake" Le, Yoshitaka Katayama, and Stephanie Gong, and alleges as follows:

-1-

## **JURISDICTIONAL STATEMENT UNDER L.R. 8-1**

1.     This is a civil action seeking monetary damages and injunctive relief for, *inter alia*, misappropriation of trade secrets.  This Court has federal question subject matter jurisdiction under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq*.  This Court has original jurisdiction over the claims alleged herein under the DTSA pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the claims alleged herein arising under state law pursuant to 28 U.S.C. § 1367(a).

## **THE PARTIES**

2.     Plaintiff MicroVention, Inc. ("MicroVention") is a Delaware corporation having its principal place of business in Aliso Viejo, California.

3.     On information and belief, Defendant Balt USA, LLC ("Balt") is a Delaware limited liability company principally engaged in the design, manufacture, and sale of medical devices and having its principal place of business in Irvine, California.

4.     On information and belief, Defendant David Ferrera ("Ferrera") is an individual residing in Orange County, California, and is a founder of Balt's predecessor company, Blockade Medical, LLC ("Blockade").  Ferrera is the former President and Chief Operating Officer of Balt.  Ferrera was formerly employed by MicroVention, first as its Senior Research and Development Manager and later as its Director of Clinical Research.  On information and belief, Ferrera is currently a General Partner at Quantum Fund OC, LLC, an Orange County-based investment firm providing funding, as well as manufacturing and managerial support to startup and early stage companies developing catheter-based diagnostic and interventional radiology technology products similar to the products sold by both MicroVention and Balt.

5.     On information and belief, Defendant Nguyen "Jake" Le ("Le") is an individual residing in Orange County, California, and is Balt's current Director of Research and Development.  Le was formerly employed by MicroVention as a Senior Research and Development Engineer.

-2-

6.     On information and belief, Defendant Yoshitaka Katayama ("Katayama") is an individual residing in Orange County, California and is Balt's current Process Engineering Manager.  Katayama was formerly employed by MicroVention as a Senior Process Development Engineer and Engineering Manager.

7.     On information and belief, Defendant Stephanie Gong ("Gong") is an individual residing in Orange County, California, and is currently employed as a Research and Development Engineer II by Balt.  Gong previously spent four summers employed by MicroVention as an engineering intern working on research and development projects.

8.     On information and belief, at all times mentioned herein, each and every Defendant was the agent, servant, employee, and/or co-conspirator of each other Defendant, and that, in performing or failing to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, and/or conspiracy, and each other Defendant ratified and affirmed the acts and omissions of the other Defendants. On information and belief, each Defendant, in taking the actions alleged herein and/or in ratifying the actions alleged herein, acted within the course and scope of such authority and/or employment and, at the same time, for their own financial and individual advantage.

9.     Whenever, as alleged herein, reference is made to any actions of Balt, such allegations shall mean that the directors, officers, employees and/or agents of Balt did perform or authorize the alleged acts or actively engaged in the management, direction and/or control of Balt and were acting within the course and scope of their employment in doing so.  Whenever reference is made to any actions of Ferrera, Le, Katayama, Gong, or any other person who is or was an employee or agent of Balt, such allegations shall also mean Balt, acting by and through said individual.

-3-

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Defendants, and each of them, because they each reside in this judicial district, transact substantial business in and maintain continuous and systematic contacts with this judicial district and the State of California, and have committed tortious acts that they knew or should have known would cause injury to MicroVention in this judicial district, all as further alleged herein.

11.     This Court has federal question subject matter jurisdiction under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836.  This Court has original jurisdiction over the claims alleged herein under the DTSA pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the claims alleged herein arising under state law pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this district under 28 U.S.C. § 1391 because (1) the Defendants, and each of them, reside in this judicial district and the State of California, and (2) a substantial part of the acts, events, omissions and injuries giving rise to the claims complained of herein have occurred and are occurring in this judicial district.

## GENERAL ALLEGATIONS

### A.     MicroVention and its Products

13.     MicroVention is an innovative medical device company founded in Southern California in 1997 to improve the treatment of diseases in small blood vessels. MicroVention's first commercial product was a line of platinum "microcoil" implants used to treat brain aneurysms.  MicroVention's microcoil implants were approved for use in 2001.  A brain aneurysm is a weak or thin spot on a blood vessel wall in the brain that balloons out and fills with blood.  When a brain aneurysm bursts, blood spills into the surrounding brain tissue.  Without medical intervention, the accumulating blood compresses the surrounding tissue, depriving brain cells of necessary oxygen and causing cell and tissue damage.   This is a life-threatening condition called a hemorrhagic stroke that effects more than one hundred thousand Americans each year.

14.     One way to treat a brain aneurysm before it bursts is to deliver tiny metal coil implants into the aneurysm, to fill the aneurysm.  This prevents new blood flow into the aneurysm, which eventually causes the existing blood inside the aneurysm to clot (a process called embolization).  In order to deliver these microcoil implants to an aneurysm, a surgeon will insert a catheter into the patient's artery and use angiography to guide the catheter through the artery and to the site of the aneurysm in the brain. Once the catheter is in place, the surgeon delivers the implant to the aneurysm by pushing the implant through the catheter using a specialized delivery device called a "pusher."  Each implant comes pre-attached to the end of its own long flexible pusher. When the surgeon has properly positioned the implant in the aneurysm, she detaches the implant from the pusher and then withdraws the pusher, leaving the implant inside the aneurysm.  Some aneurysms may require as many as 30 implants to be successfully treated.

15.     Both coil implants and the delivery system used to deliver the implants to the aneurysm are relatively new technologies.  The use of microcoil implants to treat brain aneurysms was first developed by doctors at the University of California at Los Angeles in the early 1990s, just a few years before MicroVention was founded.  These first coil implants were detached in the patient using "electrolytic detachment," a process whereby a chemical reaction causes the connection between the implant and the pusher to slowly dissolve into the patient's bloodstream over a period of minutes.

16.     Rather than using the same electrolytic detachment technology as others, MicroVention designed and developed a new innovative detachment technology for the delivery of microcoil implants to treat brain aneurysms.  In 2002, MicroVention released the MicroPlex Coil System, which included the HydroLink Detachment mechanism that used hydraulics to open a microscopic mechanical valve to release the microcoil implant from the pusher.

17.     Since then, MicroVention has maintained a steady drumbeat of new and innovative product offerings.  In 2005, MicroVention replaced its HydroLink delivery

-5-

system with V-Trak, a much faster and more user-friendly device.   V-Trak uses MicroVention's patented "thermo-mechanical" detachment, where the microcoil implant is connected to the pusher by a small pre-tensioned tether that is severed by a tiny electric heater built into the far end of the delivery pusher.   Improvements to the V-Trak resulted in the release of the V-Trak Advanced in 2014.   In both the V-Trak and V-Trak Advanced delivery systems, the surgeon detaches the implant in the patient by pressing a button on a small, handheld power source called the V-Grip.

18.     MicroVention has also made continuous improvements to its microcoil product line.   Expanding beyond its initial offering in 2002 of platinum Complex and Helical coils, MicroVention developed and marketed its extra soft filling and finishing coils (HyperSoft (2005); HyperSoft 3D (2013)), its framing coils useful in a wide variety of aneurysms shapes (Cosmos Framing Coil (2008)), its hydrogel-infused coils consisting of a water-swollen polymeric material that helps fill space in an aneurysm (HydroCoil (2006); HydroSoft (2007); HydroFrame & HydroFill (2009)), and its specialty coils for better expansion into uniquely shaped aneurysms (VFC (2010)).   This varied and growing family of embolic coils developed and offered by MicroVention, has allowed the company to better serve its customers and the patients they treat.   It has also allowed MicroVention to expand beyond the treatment of cerebral aneurysms to, among other things, the treatment of neurovascular malformations which are abnormal connections between blood vessels that disrupt regular vascular blood flow in an area of the brain.

19.     Stents can also be used in the treatment of an aneurysm to reenforce the structure of the artery at the aneurysm site and to help keep the microcoil implants secure inside the aneurysm.   MicroVention has developed a line of "coil-assist stents" for use in such procedures (LVIS & LVIS Jr. (2014, 2018)).

20.     MicroVention has also developed alternate devices called flow diverters, used in treating certain sizes of brain aneurysms.   (FRED (2012, 2020); FRED Jr. (2015)).   A flow diverter is a tightly braided mesh tube placed in the artery to cover the

COMPLAINT
Case No.

aneurysm opening, extending into the artery on both sides of the aneurysm.  Once blood flow is altered by the diverter so that it no longer flows into the aneurysm, the aneurysm shrinks in size, reducing the risk of rupture and hemorrhagic stroke.

21.    Not content to have surgeons deliver MicroVention treatment devices through other companies' catheters, MicroVention embarked on the development and production of its own catheters and access products.  MicroVention brought to market various sizes of catheters that are routed to the treatment site and through which the treatment devices are delivered.  MicroVention's intermediate catheters (SOFIA (2014); SOFIA Plus (2015)) provide stability during delivery of implantable medical devices, thereby reducing any movement or "kickback" that can occur upon detachment.  Microcatheters (Headway (2008, 2009, 2012)) are the smallest diameter catheters which route microcoil implants to the aneurysm site.  And finally, balloon catheters (Scepter C (2011); Scepter XC (2012)) which include a small inflatable balloon at the tip that expands during a procedure to assist in device delivery, to reshape parts of the blood vessels, or to assist during the injection of liquid embolics (PHIL (2014) (not available in the U.S.)), an alternate approach to inducing a blood clot in an aneurysm.

22.    In addition to its expansive and growing product line for the treatment of brain aneurysms, MicroVention has also invested its time, talent, and resources into developing treatments for other neurovascular diseases such as ischemic stroke and carotid artery disease.  Ischemic stroke, caused by a blood clot in an artery that disrupts the flow of blood to the brain, impacts nearly 700,000 Americans each year.  Ischemic stroke can be treated by removing the blood clot from inside the artery using an aspiration catheter.  MicroVention designed and developed its own aspiration catheter and in 2018 launched the highly successful SOFIA Flow Plus with an aspiration indication to market.  Carotid artery disease is a narrowing of the arteries that provide blood flow to the brain, typically by the buildup of plaque on the artery walls, possibly causing an ischemic stroke.  Although not available in the United States, MicroVention

-7-

developed the CASPER (2014), a stent that can be inserted into the artery to widen it, providing support for the blood vessel, and restoring blood flow to the brain.

23.     In the 23 years since its founding, MicroVention has designed, developed and brought to market more than 30 innovative new medical device products—products used to treat patients in the United States and around the world who are suffering from neurovascular diseases and other neurovascular challenges.

**B.     The Technical and Regulatory Challenges that Accompany Innovation and the Persistence and Resources Required to Overcome Them**

24.     Innovating in the cutting-edge medical field of neurovascular diseases presents enormous challenges.   MicroVention's treatment devices are each small enough to pass through the blood vessels of the human body and are made of even smaller sub-components, some no bigger than a human hair.  The technical design and precision manufacturing on this tiny scale are exceptionally challenging.  The materials from which these life-saving devices are made must be both durable and bio-compatible.  Physician preferences change as new devices are brought to market.  The medical device market is a highly competitive market.  Extensive and costly research and development, including extensive trial and error testing, is both necessary and unavoidable when creating new and improved devices and/or in delivering new treatment options.   Considerable knowledge is gained through this research and development process about what works and what does not.

25.     Take, for instance, catheter products such as MicroVention's Headway and SOFIA.  While the physical construction of a catheter—that is, how to make a long, flexible tube—is generally understood in the medical device industry, a key differentiator in the performance of the catheters are their hydrophilic coatings. Hydrophilic coatings are made of polymers that bind to the surface of the catheter and absorb water, thus binding the water to the catheter itself.  The catheter surface becomes smooth and slippery, reducing friction and making deployment through a patient's

blood vessels easier and safer.  Two different coatings used on the same catheter can result in significantly different performance.

26.    Hydrophilic coatings are notoriously difficult to perfect because the coating does not naturally stick to the catheter's surface.  A well-known technique called "plasma treatment" is used to clean and chemically activate the catheter surface, so the coating sticks.  If the plasma treatment recipe is inadequate, the coating may flake off in use, a disastrous result which can cause pieces to embolize in the patient's blood creating clots where they land.  Also, if the high-tech coating process is performed incorrectly, physical damage to the catheter may result.

27.    The importance of catheter coating durability is underscored by the fact that it was the subject of the largest medical device recall in history.  In 2016, Cook Medical recalled 4.1 million Beacon Tip catheters because they had been found to exhibit polymer degradation resulting in fractures or separation of the catheter tip.  In 2016 and 2017, the FDA sent teams of auditors to most major device manufacturers to perform extensive "Critical to Quality" audits of their hydrophilic coating processes.

28.    MicroVention worked for almost a year to create its own proprietary, trade secret hydrophilic coating recipes with the requisite lubricity and durability for its catheter products.  Considerable testing went into uncovering the right combination of materials for both the catheter and the coating, and into identifying the right combination of gas, time, temperature, and pressure for use in the plasma treatment process.  With every tweak of a recipe, the entire development process begins again.  Without question, MicroVention's highly successful hydrophilic coating recipes are a valuable and closely guarded trade secret.  It is used on MicroVention's catheter products including, among others, MicroVention's commercially successful Headway, SOFIA, and Scepter catheters.  These catheter products collectively generate more than $100M in revenue each year for MicroVention.

29.    Technical challenges are just one hurdle to successfully bringing a medical device product to market.  Understanding how to navigate the labyrinth of regulations

-9-

COMPLAINT
Case No.

that govern the use and marketing of medical devices in the United States and around the world can be daunting. In the United States, the FDA categorizes medical devices into one of three classes (I, II, or II), based on the degree of risk they present to patient safety. MicroVention's products span classes II (e.g., catheters and microcoils) and III (e.g., coil-assist stents and flow diverters).

30.     Just as risk rises from one class to another, so does the regulatory control to which the devices are subject. Class II devices that present "moderate" risk may be sold upon clearance of a 510(k) Premarket Notification that demonstrates the new device is "substantially equivalent" to a predicate device that has already received clearance. Class III devices that present "higher" risk require a more stringent premarket submission called a Premarket Approval ("PMA"). Before the FDA approves a PMA, the applicant must provide valid scientific evidence demonstrating reasonable assurances of safety and effectiveness for the device's intended use.

31.     Securing FDA clearance or approval for a new or improved medical device is a back and forth exchange between the applicant and the FDA that can take a significant period of time. For example, following submission of a 510(k), an applicant can expect to wait up to 90 days for the FDA's response. The first response is typically a series of questions or requests for additional information. The resulting back and forth, providing information and answering follow-up questions can take several months. Significant knowledge is gained from this process. Knowing what the FDA expects to see and which materials or processes are likely to be cleared or approved quickly is extremely valuable information. It saves time and effort, resulting in products being brought to market more quickly.

## C.     MicroVention's Proprietary Document Control System

32.     Successfully bringing one medical device product to market is difficult. Successfully launching over 30 medical device products, as MicroVention has done, requires the development and implementation of a sophisticated organizational structure which catalogues, in detail, the company's product designs and development

-10-

processes, its research and development efforts, and its test results, among other things. It also requires a sophisticated knowledge management system directed at regulatory compliance, customer feedback, and marketing, as well as other business practices that can position the company for success in a highly competitive industry.

33.   MicroVention developed, over many years, a robust system of policies, processes, and procedures designed to guide the company and streamline its business. This includes an interconnected library of controlled documents in which MicroVention records, in detail, its current projects, future plans, product designs, recipes, procedures, verification methods, test results, and other highly confidential trade secret information. In one sense, these documents *are* MicroVention.   In these controlled documents, MicroVention captures the hard-earned lessons learned for future use.   The documents are updated to reflect design changes made in response to customer feedback, to add new features, or to design around common failure modes.   In an industry where knowing what does not work is just as valuable as knowing what does, a collection of proprietary documents reflecting time-tested knowledge is worth tens of millions if not hundreds of millions of dollars in time and cost savings.   These controlled documents detail not just how to design, develop, test, and gain regulatory approval for specific medical devices, but how to create and operate a successful medical device company.

34.   The following sections illustrate a typical product life cycle and the value of these proprietary controlled documents.

**1.   MicroVention's Marketing Specification**

35.   A MicroVention product begins with a Marketing Specification that reflects what customers want in a new medical device.   This controlled document describes, at a relatively high level, the intended uses of the device, the intended users, and in which countries the device should be sold.   It also lists the key performance criteria that MicroVention believes will make the medical device successful.   At this stage, the performance criteria are a mix of qualitative criteria gleaned from interviews with potential customers and quantitative criteria to ensure compatibility with other

-11-

medical device products currently on the market.  For example, physicians may request that a new microcoil line be "stiffer" or "softer" than currently available options, or that the maximum outer diameter of the microcoil and delivery system be of a certain size to be compatible with catheters currently on the market.  The Marketing Specification, in essence, pulls together competitive intelligence on the needs of target customers and the anticipated commercial acceptance and success of the new device.

### 2.    MicroVention's Design Specification

36.    The Design Specification is MicroVention's top-level controlled document that sets forth the detailed specifications for a MicroVention medical device. Creating the Design Specification is a time and resource intensive process.  The Design Specification covers every aspect of a device.   It specifies product dimensions, component materials, sterility, shelf-life requirements, how the device will be introduced into the patient's body, biocompatibility, and even packaging and labeling. The design process is an iterative process that can take hundreds of hours to define just one design value or performance parameter.  It can also involve hundreds of hours of testing, and dozens of failed attempts, to specify the right materials or component parts. The Design Specification also sets forth the test methods to be used in verifying compliance with processes and regulations and references dozens of other controlled documents that drill down on various aspects of the new medical product's design.

37.    The Design Specification is, at its core, a highly confidential, proprietary roadmap that captures the entire design process.  Having, in hand, MicroVention's Design Specifications would provide a competitor with a significant competitive advantage.   That competitor could avoid the time intensive and expensive design process, skipping directly to specified dimensions, processes, materials, and components, among other things, that have been tested and that are known to work. Without question, designing competitive products would be much easier, faster, and cheaper with access to, and the use of, MicroVention's highly confidential Design Specifications.

### 3. MicroVention's Prototype Documents

38. Prototype devices are built and tested based on the Design Specification. Testing of prototype devices leads to design changes and updates to the Design Specification. As this iterative process moves forward, a final product emerges that meets the requirements of the Design Specification. As part of this phase, MicroVention creates several groups of confidential, controlled documents in parallel: Part Drawings, Manufacturing Procedures, Test Methods, and Risk Assessment Plans.

39. MicroVention engineers create Part Drawings using Computer Aided Design (CAD) software such as SolidWorks. These are scaled drawings that specify the dimensions of each part to be constructed and the materials from which the parts should be made. Manufacturing parts with exactness, particularly a large number of parts, is impossible, so Part Drawings also include tolerances for each dimension, i.e., how much a part dimension is allowed to deviate from the exact dimension. Knowing part tolerances is critical to ensuring that the various manufactured component parts can be successfully assembled resulting in a final assembled device that is the appropriate size and compatible for use with other parts of the device. Part Drawings also specify inspection methods for use during construction to verify that the part meets the specifications called out in the drawing. During early prototyping, there may be significant changes from one iteration of a Part Drawing to the next, but as the design draws closer to the finished product, the changes become more subtle. Ultimately, the Part Drawings are assigned a release number as the part design is finalized and ready for manufacture.

40. Manufacturing Procedures are controlled documents that provide detailed, step-by-step instructions for production line workers and operators for carrying out a specific manufacturing task. These controlled documents are highly confidential and proprietary. They may outline, for example, precisely how to solder electrical wires to a heater coil or connect two subassemblies using a specified adhesive. They may detail specifically how hard to pull on a component piece (as measured by a force gauge) or

exactly how to tie a particular knot. Manufacturing Procedures often contain photographs of each required step in the manufacturing process to illustrate for the operators what to do and how to do it. During the early research and development or prototyping stage, the Manufacturing Procedures change frequently as the product's design evolves and the kinks in the manufacturing process are worked out.

41. Test Methods are used to verify that medical devices in production conform to their specifications. These controlled documents are highly proprietary and extremely valuable. Test Methods for each product are independently developed by MicroVention. Test Methods are not intuitive simply by looking at the finished product. Test Methods reflect the results of hundreds of hours of experimentation to identify what works—experimentation that is often repeated multiple times.

42. The FDA requires that all Test Methods be validated. Medical device manufacturers like MicroVention must demonstrate to the FDA with extensive documentation that the specific Test Method used to verify product performance is suitable for that purpose. The uncertainty inherent in a Test Method must also be disclosed. Although the FDA may issue guidance on which Test Methods it wants manufacturers to employ, more often the choice is left to the manufacturers. As a result, Test Methods are independently developed through significant investment of time, talent, and resources. Obtaining validation of Test Methods by the FDA is a substantial undertaking, the results of which are not shared among competitors.

43. Moreover, test data and results documented in Test Method controlled documents can also form the basis for product marketing claims—claims that support the device's performance and reliability. Because Test Methods are unknown to one's competitors, MicroVention's competitors do not know whether their own competitive devices may be less reliable than MicroVention's device or whether they are simply being tested in slightly different ways. Subtle unknown differences in the Test Methods used to test functionally comparable products can lead to different performance data and, therefore, different marketing claims.

-14-

44.     MicroVention also creates Risk Assessment Plans at the start of the prototype development process for any new medical device.  The mitigation of risk is critical to the successful development and deployment of medical products.  These controlled documents reflect MicroVention's catalogued historical experience designing and developing similar medical devices.  Risk Assessment Plans can include feedback on product use and experience that led to product changes and improvements.  They may reflect slight or significant differences between anticipated failure rates and modes and the failure rates and modes experienced while the device is in actual use.  The importance of risk assessment documentation is underscored by the fact that the FDA mandates that such documentation be kept and updated.  As an integral part of the design and development of new medical device prototypes, MicroVention creates and updates its Risk Assessment Plans to reflect new test data, developments, and updated risk assessments.  MicroVention's Risk Assessment Plan controlled documents reflect a vast wealth of information that is critical to its business and of immense value in the design and development of new medical devices.

### 4.     MicroVention's Design Verification & Process Validation

45.     Eventually, the iterative prototyping process yields a product design that meets the extensive list of requirements captured in the Design Specification.  Design Verification reflects a thorough review of the resulting product design and the corresponding test data that demonstrates compliance with the Design Specification.  Once Design Verification has been approved by MicroVention representatives from key departments such as engineering, quality control, marketing, and operations, the new product design is effectively locked.

46.     Process Validation plays a similar role but is focused on finalizing the processes and manufacturing procedures that will be used to make the product once it enters production.  The Risk Assessment Plan documents are updated to incorporate everything learned throughout the design and prototype development phase.  When Design Verification and Process Validation are complete, it can be said that the new

medical device has been created.  The controlled documents from the Design Specification through Process Validation are collectively referred to as the Design History File, which must be submitted to the FDA as part of the regulatory approval process for any new product.

### 5.    MicroVention's Manufacturing and Production Documentation

47.    Once FDA clearance or approval is received, manufacturing resources are organized, and production of the approved medical device begins.  Controlled documents such as Build Records, Equipment Specifications, and Tool Drawings, among others, play a critical role in the manufacturing and production process.

48.    MicroVention's Build Records detail exactly how to make their medical devices.  Where Manufacturing Procedures provide detailed instructions to operators for completing a particular step in the manufacturing process, Build Records detail the required steps and the order in which they must be completed.  To illustrate, a Build Record may list 20 or more major steps involved in manufacturing a given product, beginning with the issuance of a work order, and culminating in a quality control inspection protocol.  The Build Records specify, for each step, the specific Manufacturing Procedures and Part Drawings involved along with detailed, step by step instructions on how to build the device.  Build Records also contain a Bill of Materials for the product being manufactured.  The Bill of Materials specifies exactly what materials to use in making the device.  Further, given that each step in the manufacturing process must be signed off on by the operator who performed the step, and given that these sign offs are recorded in the Build Records, these controlled documents provide an auditable paper trail in connection with the building of each MicroVention medical device.  This allows for problems discovered during the quality control process to be properly investigated, resolved, and documented.  Possession of MicroVention's highly proprietary, confidential Build Records would provide any competitor with a precise roadmap for building MicroVention products.

49.    Key to the manufacturing process, and almost as important as the controlled documents that detail the design and development of the medical devices themselves, are the MicroVention controlled documents that identify and describe the equipment and tools used by MicroVention in its manufacturing process.  It is one thing to know how to make a product; it is quite another to know how to construct a machine that automates or facilitates that product's manufacture.

50.    Equipment Specifications are the equivalent of Design Specifications for the equipment used by MicroVention.  While MicroVention does purchase from third parties some equipment used to manufacture its products, most of the equipment used by MicroVention in the manufacturing process is equipment it designed and built in-house.    Whether  purchased  or  developed  in-house,  the  equipment  used  in MicroVention's manufacturing process must conform to the Equipment Specification, as well as to equipment verification procedures knowns as IQOQs (short for Installation Qualification Operational Qualification).

51.    The Equipment Specification controlled documents reflect important insights into MicroVention's confidential and proprietary manufacturing processes. This is true whether the equipment specified is purchased off-the-shelf from a third party or developed in-house.  With equipment purchased from third parties, the actual equipment purchased and from which manufacturer can lead to important information concerning  the  identification  of  compatible  equipment.    As  for  manufacturing equipment built in-house, the Equipment Specifications, Equipment Drawings, and Tool Drawings associated with this equipment are of critical importance.  Many medical device  companies  outsource  equipment  design  and  fabrication  because  of  the considerable time and expense involved with that process.  As with product design, the design and development of manufacturing equipment and tools is iterative, requiring testing and refinement before the right equipment and tool designs are identified and perfected for the devices being manufactured.

-17-

52.     MicroVention devotes substantial time and resources to designing, building, and refining its proprietary manufacturing equipment and tools.  One of the primary reasons it does this is to protect the confidential nature of MicroVention's manufacturing processes which it considers to be its valuable trade secrets.  Maintaining the confidentiality of the Equipment Specifications, Equipment Drawings, and Tool Drawings for equipment and tools developed in-house by MicroVention is essential to protecting the confidentiality of these manufacturing processes and the considerable investment that MicroVention has made in the development of its business.

**6.     Other Proprietary Controlled Documents**

53.     In addition to the controlled documents set forth above, MicroVention maintains many other files and types of controlled documents depicting important and detailed information critical to the design and manufacturing of its products and to the operation of its business.  Examples of these documents include Regulatory Strategy and Submission Checklists, EC Declarations of Conformity, Essential Requirements Checklists, Design and Development Project Plans, Design Review Approval Forms, Quality Plans, Customer Needs Memorandums, Receiving Specifications, Test Protocols, Test Reports, Quality Manuals, Quality Assurance Procedures, Quality Specifications, Engineering Orders, Preventative Maintenance documents,   and Approved Supplier Lists, among others.

**D.     The Safeguarding of MicroVention Trade Secrets and Confidential Information**

54.     As illustrated above, the proprietary, trade secret information that is the core of MicroVention's business is contained in its vast interconnected library of controlled documents.  This contains both the technical documentation discussed above, as well as an extensive knowledge management system that includes regulatory compliance information, customer feedback, and sales and marketing information.  This highly confidential, proprietary information is entrusted to MicroVention employees who require access to such information to do their jobs.

-18-

55.     MicroVention invests heavily in the development and training of its work force, emphasizing the importance of confidentiality in every aspect of the company's business.  Employees are trusted with its most valuable assets—the proprietary design and manufacturing information and the knowledge management system upon which MicroVention's business is built.

56.     From its inception, MicroVention has undertaken significant efforts to safeguard the confidentiality of its controlled documents, as well as its other confidential and proprietary information.  The sophistication of these protections progressed as technology evolved and as the company grew.

57.     MicroVention controlled documents reside in electronic databases with restricted access.  An authorized employee must log in to the system using a password protected account.  Multiple passwords and protections are required for access to certain types of information including detailed sales information, and department and company budgets, among other things.

58.     MicroVention uses security software to protect its technology resources and audits compliance with its security policies.  MicroVention also uses confidentiality legends to identify confidential and proprietary information.

59.     Printed documents used in the manufacturing process and on production lines are safeguarded under lock and key.  Physical access to proprietary equipment is restricted as is access to the computers that interface with that equipment.  Both are password-protected, and access and use are restricted to specified research and development or manufacturing engineers.

60.     All MicroVention employees receive training on the importance of maintaining the confidentiality of company information and documentation. Employees are required to sign a propriety information agreement which outlines the types of proprietary information the company maintains and the importance to MicroVention of maintaining the confidentiality of that information.  It also requires employees to return all company property, including all electronic information and

-19-

written materials, prior to their departure from MicroVention.  All departing employees must complete an exit interview upon their departure.  Departing employees are reminded during that exit interview of their ongoing confidentiality obligations to MicroVention.  Departing employees are also asked to certify, in writing, that they have returned to the company all of its property, including all written and electronically stored information and that that they are not taking any MicroVention property with them.

61.    As for MicroVention's facilities, they are closed to the public.  Only authorized personnel are allowed on premises.  Buildings are access-controlled, and badges are required.  Visitors must sign in at the reception desk and must prominently wear a "Visitor" badge.  Visitors are not permitted to roam MicroVention's physical facilities but must instead be escorted by an authorized MicroVention employee.  Photographs, video recordings, and cell phone use are not permitted in either the clean rooms or in production facilities.  Vendors, suppliers, and physicians who are permitted to tour MicroVention facilities or who are working in collaboration with MicroVention must sign Non-Disclosure Agreements ("NDAs").

62.    Without question, MicroVention has implemented the processes and procedures reasonable and necessary to protect and maintain the confidentiality of its trade secrets and other proprietary information.

**E.    The Individual Defendants and The Theft of MicroVention Trade Secrets and Other Confidential and Proprietary Information**

63.    Each of the named individuals in this action (the "Individual Defendants") are former trusted MicroVention employees.  Each of these Individual Defendants had access to MicroVention trade secrets and other confidential and proprietary information necessary to perform their job responsibilities.

64.    Defendant David Ferrera ("Ferrera") was employed by MicroVention from July 1999 until August 2007, first as Senior Research and Development Manager and later as Director of Clinical Research.  Ferrera's responsibilities spanned the gamut from

-20-

technical product development to supporting sales and marketing personnel.  During the development of MicroVention's V-Trak system, Ferrera was the company's primary liaison with customers and was intimately involved in the process of translating customer wants and needs into product design specifications and ultimately, into a marketable medical device product.  It was during Ferrera's employment, that MicroVention commenced the creation of its controlled documents library.  As set forth above, this interconnected library contained detailed documentation on the marketing specifications, product designs, and manufacturing processes undertaken in the development of MicroVention's early products.  These early products included the MicroPlex Coil System with its hydraulic detachment controller, the V-Trak delivery system with its thermo-mechanical detachment mechanism, and MicroVention's first Hydrogel microcoils.  Ferrera was also present during the design, development, and market launch of MicroVention's first catheters and other access products.

65.    As both Senior Research and Development Manager and Director of Clinical Research, Ferrera had access to a broad range of highly proprietary, trade secret technical, operational, and business information.  This included the library of controlled documents, as well as sales figures, budgets, marketing analyses, and customer preference information, among other things.

66.    Ferrera's employment with MicroVention ended in or around August 2007.  On information and belief, following his departure from MicroVention, Ferrera was involved in at least one other medical device company before founding Blockade Medical, LLC ("Blockade") in November 2011.  Blockade is the predecessor to Defendant Balt.  Ferrera served as Balt's President, Chief Operating Officer, and Chief Technology Officer during his tenure with Balt.  Ferrera departed Balt in May 2020.

67.    Defendant Nguyen "Jake" Le ("Le") was employed by MicroVention from approximately May 2008 until November 2011, first as a Manufacturing Engineer II and later as a Senior Research and Development Engineer.  While employed at MicroVention, Le worked extensively on MicroVention's microcoil technology

-21-

including on the research, development, and manufacturing of the V-Trak delivery system.  As an engineer, Le was intimately involved in the research and development of MicroVention medical devices, including the design, manufacturing, and testing of these devices, as well as the equipment and tools used in connection with the same.  As a result, Le had access to and use of MicroVention's extensive library of controlled documents and to its knowledge management system.

68.     Although Ferrera and Le did not work at MicroVention at the same time, on information and belief, Ferrera and Le knew one another and socialized with one another, sometimes including other current and former MicroVention employees.  Le departed MicroVention to join Ferrera in starting Blockade.  On information and belief, Le has been continuously employed by Balt (formerly Blockade) from 2011 to the present, and currently serves as Balt's Director of Research and Development.

69.     Defendant Yoshitaka Katayama ("Katayama") was employed by MicroVention from August 2011 until March 2018, first as a Senior Process Development Engineer and later as the Engineering Manager responsible for the V-Trak Advanced delivery system before being demoted to a Staff Engineer position.  The nature of Katayama's job responsibilities required that he possess detailed knowledge of many MicroVention medical device products including SOFIA and other catheter and access products, microcoils and the V-Trak delivery system, FRED flow diverters, and LVIS coil-assist stents.  As a result, Katayama had access to and use of MicroVention's extensive library of controlled documents.

70.     Katayama terminated his employment with MicroVention in March 2018.  On information and belief, he did so to join Ferrera and Le at Balt, where he is currently employed as Balt's Process Engineering Manager.

71.     Defendant Stephanie Gong ("Gong") was employed by MicroVention as a Research and Development Engineering Intern during each of the four summers between 2014 and 2017.  Gong's responsibilities included, among other things, aiding in the completion of Build Records, assisting with the testing of product design units,

-22-

drafting engineering protocols, conducting stent performance testing, and overall research and development support.  Gong worked on projects involving MicroVention's Scepter balloon catheters and the V-Trak delivery system.

72.    Following Gong's departure from MicroVention in September 2017, on information and belief, Gong was hired by Balt in March 2018 where she is currently employed as a Research and Development Engineer II.

73.    As a condition of their employment with MicroVention, each of the Individual Defendants, Ferrera, Le, Katayama and Gong, were required to sign an Employee Invention and Confidential Information Agreement (the "Confidentiality Agreement") whereby they agreed, among other things, to keep confidential and to not disclose or make use of, except for the benefit of MicroVention, either during or after their employment, any trade secrets, confidential information, knowledge, or other information known to MicroVention relating to its products, processes, know-how, designs, formulas, data, inventions, customers lists, business plans, marketing plans and strategies, pricing strategies or other matters pertaining to the business of MicroVention.  This included all information that these Individual Defendants produced, obtained, had access to, or otherwise acquired during their employment. Each of these Individual Defendants also agreed that they would not deliver, reproduce or in any way allow any of MicroVention's trade secrets or proprietary information to be delivered to, or used by, third parties without the specific direction or consent of a duly authorized representative of MicroVention.

74.    The Confidentiality Agreement that was signed by each of the Individual Defendants also required them to return to MicroVention all information and materials of the Company upon termination of their employment.  The Individual Defendants each agreed to promptly surrender and deliver to MicroVention, all records, materials, equipment, drawings, documents, and data of any nature pertaining to any invention, trade secret or confidential or proprietary information of the Company and to not take any of this confidential information, or a description of such information, with them

-23-

upon their departure.  Further, the Individual Defendants agreed to sign and deliver to MicroVention, upon termination of their employment, a "Termination Certificate" certifying that they did not have in their possession, nor had they failed to return, any records, documents, computer disks, tapes or printouts, sound recordings, customer lists, photographs, data specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies of them, or other documents or materials, equipment, samples, prototypes, models or other property belonging to MicroVention.   The Individual Defendants further agreed to certify that they were in compliance with the Confidentiality Agreement, and that they would preserve as confidential all trade secrets, confidential or proprietary information, knowledge, data or other information relating to products, inventions, processes, know-how, designs, formulas, test data, and customers lists, among other things, pertaining to the business of MicroVention.

75.    On information and belief, despite the contractual promises made by Ferrera, Le, Katayama, and Gong to MicroVention, each of the Individual Defendants took with them, upon their departure from MicroVention, documentation and information consisting of MicroVention's trade secrets, as well as confidential and proprietary information, in violation of the Confidentiality Agreement.  Each of the Individual Defendants failed to surrender and/or refused to return to MicroVention its intellectual property as required pursuant to the terms of the Confidentiality Agreement. Upon information and belief, certain of the Individual Defendants certified, at the time of their departure from MicroVention, that they had returned to MicroVention all of its property, including the trade secrets and proprietary and confidential information and documentation in their possession, knowing that the certification provided was untrue. Defendant Katayama refused to sign the Termination Certificate upon his departure from MicroVention, also in violation of his obligations under the Confidentiality Agreement.

76.    In further breach of the Confidentiality Agreement entered into by each of the Individual Defendants, on information and belief, the Individual Defendants each

COMPLAINT
Case No.

took MicroVention's trade secrets and other confidential and proprietary information with them upon their departures, to use for the benefit of their new company and/or employer.  On information and belief, each Individual Defendant, on his or her own behalf and/or in collusion with the other Individual Defendants, brought MicroVention's trade secrets and confidential and proprietary information to Balt with the express intention of using that information for the benefit of their new company (Blockade) and/or employer (Blockade/Balt).  On information and belief, the Individual Defendants did use MicroVention's trade secrets and confidential and proprietary information for the benefit of Balt and its predecessor, Blockade.

77.     MicroVention was unaware of the theft of its trade secrets and its confidential and proprietary information by the Individual Defendants until just recently, when Balt produced over fifty-five thousand (55,000) proprietary and confidential documents belonging to MicroVention in discovery in a separate patent infringement lawsuit filed by MicroVention against Balt.

78.     On information and belief, Le, upon his departure from MicroVention and at the behest and encouragement of Ferrera, stole vast amounts of documents containing the trade secrets and confidential and proprietary information of MicroVention.  What was stolen from MicroVention was a complete "how to guide" for building a successful medical device company and its products.  On information and belief, Le took these highly proprietary documents from MicroVention so that he and Ferrera could use them to build Blockade, a competing medical device company.  On information and belief, Ferrera and Le knew that by using MicroVention trade secrets and proprietary and confidential information, they could short cut the time, labor and financial investment needed to get their small startup company up and running.  On information and belief, Ferrera and Le knew that the use of MicroVention trade secrets and proprietary and confidential information would save them tens of millions if not hundreds of millions of dollars in startup costs, including research and development costs, and would short cut considerably their time to market with competitive medical device products.

-25-

79.     On information and belief, Le, with the support, encouragement, and assistance of Ferrera, accessed and stole vast amounts of information from both the controlled documents library and the knowledge management system at MicroVention on his way out the door.   On information and belief, Blockade (now Balt) was built using this stolen information, including its entire company infrastructure, from product specification to design and development, to production and testing, to compliance and more.   As a result, on information and belief, Defendants developed and brought copycat medical device products to market faster and with significantly less financial investment given their ability to capitalize on the stolen MicroVention proprietary and confidential information.   By capitalizing on this stolen information, Defendants obtained a substantial head start in building their business and designing and developing competing medical products, culminating in the sale of Blockade to Balt International, a French company, in just five (5) short years for in excess of  $42M.  Blockade was re-branded as Balt USA following its sale.

80.     On information and belief, the theft of MicroVention trade secrets and proprietary and confidential information did not stop with Ferrera and Le's departures from MicroVention.  On information and belief, through their personal and professional relationships with existing MicroVention employees, Ferrera and Le continued to mine and misappropriate from MicroVention trade secrets and other confidential and proprietary information that both knew they were not entitled to possess, and that they then used for their own financial benefit and for the benefit of Balt.

81.     On information and belief, with the knowledge, support, and encouragement of Ferrera and Le, Individual Defendants Katayama and Gong left their employment with MicroVention to join Balt.  On their way out the door, on information and belief, Katayama and Gong, like Ferrera and Le, stole trade secrets and confidential and proprietary information from MicroVention and brought it with them to Balt to use for the benefit of their new employer.

-26-

82.     As mentioned above, MicroVention was unaware of the theft of its trade secrets and its confidential and proprietary information by trusted employees, Ferrera, Le, Katayama, and Gong.  As discussed in more detail below, MicroVention was also unaware of the use of this stolen information by Balt until just this year when it was uncovered in discovery in another lawsuit between MicroVention and Balt.   On information and belief, Balt attempted to hide the existence of these MicroVention documents in Balt's possession by, among other things, delaying the production of this information in discovery for almost a year.

**F.     Blockade's Launch of its Unsuccessful Barricade Product**

83.     As set forth above, on information and belief, Balt's predecessor, Blockade, was built using stolen MicroVention trade secrets and confidential and proprietary information.  Within 18 short months Ferrera, Le, and Blockade obtained FDA approval for, and commenced selling their first and only commercial medical product, Barricade.

84.     Barricade is a platinum coil system for treating brain aneurysms.  It is based on outdated electrolytic detachment technology, which is slower, less user friendly, and carries a greater risk to patient safety.  For at least those reasons, the Barricade system was not a commercial success.

85.     On information and belief, the commercial failure of the Barricade system required Defendants to pivot.  Eager for a quick payout on their new startup venture, on information and belief, Ferrera, Le and others began development of a copycat thermal detachment implant coil and delivery system to mimic MicroVention's commercially successful V-Trak system.  On information and belief, this new product, which became known as the Optima Coil System ("Optima"), was designed, and developed by using MicroVention's trade secrets and confidential and proprietary information.

86.     Transitioning from a coil implant system that uses electrolytic detachment to one that uses thermal detachment requires changes to every part of the implant coil and delivery system.  This includes, among other things, changing the tether that

-27-

1  connects the implant and pusher, redesigning the pusher to include a resistive heater

2  coil at its tip, and developing a completely different detachment controller.

3  Implementing these changes requires considerable skill and effort, including many

4  hundreds of hours spent gathering physician feedback on the product's design,

5  identifying design parameters, selecting and testing materials and equipment, refining

6  the design, materials, and production processes, testing the materials and components,

7  and gaining FDA approval to market the new product.  On information and belief,

8  Defendants by-passed this extensive and expensive process and instead, tapped into the

9  treasure trove of trade secrets and confidential and proprietary documents stolen from

10 MicroVention.  These documents taken from MicroVention's controlled documents

11 library and knowledge management system gave Defendants step by step instructions

12 on how to design, develop, test and market a copycat V-Trak system.

13        87.    Further, on information and belief, the expansive theft of MicroVention's

14 intellectual property by Defendants is underscored by their brazen and unimaginative

15 verbatim copying of large sections of MicroVention's "Instructions for Use" guide that

16 is shipped with its V-Trak system.

17        88.    The critical importance of MicroVention's thermal detachment technology

18 to the acquisition of Blockade by Balt cannot be overstated.  On information and belief,

19 Ferrera himself conceded the importance of this technology, stating in a March 2, 2018,

20 email to Tom Fogarty, then CEO of Neurvana Medical, LLC, a company for which

21 Ferrera had served as chairman of the board of managers, that "Balt paid $42.5M to

22 acquire Blockade.  That value was essentially for the Optima Coil system."

23 **G.    Uncovering Defendants' Theft of in Excess of 55,000 Confidential and**
   **Proprietary MicroVention Documents**
24

25        89.    MicroVention first became aware of the Balt Optima Coil System when it

26 learned of the product's FDA 510(k) approval in a Balt press release dated March 20,

27 2018.

28

-28-

90.    A few months later, on June 11–13, 2018, MicroVention employee Heath Bowman ("Bowman"), then MicroVention's Director of Research & Development, attended the Live Interventional Neuroradiology, Neurology & Neurosurgery Course (LINNC) in Paris, France.  During this course, Bowman attended a session entitled "Balt Industry-sponsored Symposium" that included a presentation on Balt's new Optima medical device product.  Immediately recognizing the uncanny similarity between the Optima and the V-Trak, Bowman took photographs of the presentation slides touting the "key features" of Balt's new product.  Thereafter, MicroVention undertook an investigation into the new Balt Optima product, including conducting testing on the product itself.  It was determined, following this investigation, that the Optima is a direct copy of MicroVention's V-Trak.

91.    On July 8, 2019, MicroVention filed suit against Balt in this District for patent infringement, asserting that Balt's Optima Coil System infringes multiple patents held by MicroVention covering technology used in Balt's new Optima medical product. At the time the patent lawsuit was filed, MicroVention was unaware of Defendants' wholesale theft and use of MicroVention trade secrets, as well as other confidential and proprietary information.  However, given the outcome of MicroVention's testing of the Optima and the likely involvement of key, former MicroVention employees and Individual Defendants Ferrera and Le in the development of that product, MicroVention explored early on in discovery in the patent case, the possibility that these former trusted employees, as well as others, may have taken trade secrets and other proprietary and confidential information from MicroVention upon their departure.

92.    On September 25, 2019, MicroVention served four document production requests on Balt aimed at discovering whether Balt had any MicroVention documents in its possession.  Specifically, the requests asked for all non-publicly available MicroVention documents in Balt's possession whether obtained through any former MicroVention employee or consultant, all documents bearing certain MicroVention confidentiality legends, and all CAD drawings for MicroVention products.

-29-

93.    Balt spent nearly ten months dragging its feet and attempting to dodge its production obligations.  Finally, in response to MicroVention's threat of a motion to compel absent immediate compliance, on August 14, 2020, Balt handed over 55,000 individual files containing documents stolen from MicroVention.  This production of stolen information spanned more than 186,000 pages, representing every conceivable document type set forth in MicroVention's controlled documents library and knowledge management system.  This included, but was not limited to, Marketing Specifications, Design Specifications, Part Drawings for products, tools, and equipment, Manufacturing Procedures, Test Methods, Test Protocols, Test Reports, Test Data, Build Records, Supplier Lists, Customer Needs Memorandums, Regulatory Filing Checklists, Quality Manuals, and even MicroVention's Employee Handbook and drawings depicting the layout of MicroVention's facilities.

94.    The trade secrets and confidential and proprietary information stolen from MicroVention included not just design and development documents for the V-Trak system (Defendants had possession of multiple revisions of the V-Trak documents), but also for other MicroVention products including microcoil implants, Scepter balloon catheters, Headway catheters, and the LVIS coil-assist stents, among others.

95.    In addition, Balt produced back to MicroVention an entire cloned computer hard drive containing trade secrets and other proprietary and confidential information pertaining to MicroVention's hydrophilic coatings for its entire line of catheter and access products, including the Headway, SOFIA, and Scepter.  These stolen process recipes took MicroVention almost a year of experimentation to perfect.  By loading these files—conveniently grouped on the hard drive in a single folder entitled "Recipes"—onto a computer controlling a plasma machine, Defendants had everything they needed to replicate these proprietary recipes.  On information and belief, Defendants have used, without MicroVention's knowledge or consent, these highly proprietary and valuable process recipes in the design and development of competing medical products.

-30-

COMPLAINT
Case No.

96.    Given the computers that control the plasma treatment machines and store the proprietary coating recipes at MicroVention are password-protected, only a MicroVention Research and Development or Manufacturing engineer would likely have been able to access and make a mirror image of the computer files reflected in Balt's document production.  Balt represented, in producing the information, that these computer files were associated with Defendant Le.  At the time of his departure from MicroVention, Le was a Senior Research and Development Engineer for MicroVention.

97.    While Balt represented that the custodians of the information stolen from MicroVention was limited to Defendants Ferrera and Le, a review of the metadata for the produced documents suggests otherwise.  Eighty-four (84) of the stolen documents produced by Balt were created between December 1, 2011, and February 28, 2012, after both Ferrera and Le departed MicroVention.  These documents include Manufacturing Procedures, Part Drawings, and Quality Control Procedures, many of which relate to MicroVention's LVIS coil-assist stents and FRED flow diverters.

98.    On information and belief, given the creation date of the aforementioned documents, the actual theft of certain highly proprietary, confidential information appears to have been undertaken by others including, but not limited to, Individual Defendants Katayama and Gong.  On information and belief, after his departure from MicroVention, Defendant Le instigated, solicited and directed then existing MicroVention employees to steal trade secrets and other proprietary and confidential documents from their employer and to bring such information with them upon joining Balt, and/or simply to provide it to Le for Balt's use.  On information and belief, Le intentionally used his personal and professional connections with these current and former MicroVention employees to induce them to violate their contractual obligations to MicroVention.

99.    Similarly, one of the stolen documents produced back to MicroVention by Balt in discovery is a slide deck from an Investors Meeting of MicroVention's parent company, Terumo.  The custodian Balt identifies as associated with this document is

-31-

Defendant Ferrera.  Although the presentation given on March 14, 2014, may have been publicly accessible, the corresponding slide deck in Ferrera's possession was not.  On information and belief, Ferrera, like Le, used his connections and influence with his former colleagues at MicroVention, to solicit and obtain, in knowing violation of their confidentiality obligations, confidential information such as this.

100.   On information and belief and as referenced above, Individual Defendant Katayama is one of MicroVention's former employees that Ferrera and Le used to mine MicroVention trade secrets and confidential and proprietary information.   On information and belief, Ferrera and Le instructed Katayama to take MicroVention documents upon his departure, and Katayama did so.   On information and belief, Katayama left MicroVention in March 2018 to work for Le at Balt as his Process Engineering Manager.   On information and belief, based on his prior employment at MicroVention, Le knew that Katayama, having been employed for nearly seven (7) years in various engineering roles at MicroVention, would have access to highly proprietary technical information that could be beneficial to Balt's product development and overall business.

101.   Consistent with the foregoing, upon his departure from MicroVention, Katayama refused to sign his Termination Certificate, acknowledging and certifying that he had returned all MicroVention property, including documents, to the company and that he was not taking any MicroVention property with him.   On information and belief, Katayama refused to sign the Termination Certificate precisely because he took such information.

102.   On April 1, 2020, Balt produced three identical copies of an Excel spreadsheet authored by MicroVention employee Heath Bowman.   The spreadsheet contained confidential and proprietary information used to compute the k-value (or stiffness) for different microcoil configurations and referenced certain MicroVention products by part number.   The three spreadsheets were produced in three separate folders along with Parts Drawings for three different parts.   The metadata associated

-32-

with all three files identifies Individual Defendant Gong, the four-time MicroVention intern now Balt Research and Development Engineer, as the Balt employee associated with these highly proprietary stolen documents.  On information and belief, Gong, in collaboration with the other Individual Defendants, stole this proprietary and confidential information from MicroVention upon her departure from the company.

103.   On information and belief, as many as fifty (50) former MicroVention employees have been employed by Balt, primarily as engineers and product assemblers. On information and belief, Defendants actively solicit and target to hire MicroVention employees with specialized knowledge of MicroVention's products, processes and procedures, and with the specific intent to capitalize on such knowledge by inducing these employees to breach their confidentiality obligations to their former employer and provide Balt with access to, and use of, MicroVention trade secrets and confidential and proprietary information.  By way of example, on August 17, 2019, just six weeks after MicroVention filed its patent lawsuit against Balt, Ferrera, then Balt's Chief Technology Officer, reached out to MicroVention employee Joe Gulachenski via text message, asking, "Who's designing catheters at Microvention [sic] now?".  Two days later, after Gulachenski had not replied, Ferrera pressed the issue again, asking, "Are you ignoring me?"

104.   On information and belief, Ferrera left Balt in May 2020 to work with a venture capital firm focused on medical device startup companies in the same neurovascular field as MicroVention and Balt.  On information and belief, substantial risk exists that Ferrera will continue his practice of soliciting, mining and using stolen MicroVention trade secrets and confidential and proprietary information to benefit himself and the companies in which he either works or has a financial interest.

105.   Given the vast theft of MicroVention trade secrets and confidential and proprietary information by Defendants over a number of years as depicted in over 186,000 pages of stolen documents, MicroVention is certain to uncover further atrocities committed by Defendants resulting in harm to MicroVention.

-33-

## FIRST CAUSE OF ACTION

### (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act – 18 U.S.C. § 1836, *et seq.*- Against All Defendants)

106.   MicroVention realleges and incorporates by reference paragraphs 1 through 105 above as though fully set forth herein.

107.   MicroVention owns and possesses trade secrets as specifically set forth in this Complaint.  These trade secrets include a robust system of policies, processes, and procedures prepared by MicroVention for use in its business.  This includes, among other things, an interconnected library of controlled documents in which MicroVention records, in detail, its current projects, future plans, product designs, recipes, procedures, verification methods, test results, and other highly confidential trade secrets.  It also includes a sophisticated knowledge management system containing, among other things, regulatory compliance information, customer feedback, and competitive marketing, sales, and other sensitive business information.

108.   These trade secrets are reflected in MicroVention's Marketing Specifications, Design Specifications, Part Drawings, Manufacturing Procedures, Test Methods, Risk Assessment Plans, Test Protocols, Test Reports, Test Data, Process Validation Records, Build Records, Equipment Specifications, Tool Drawings, Approved Supplier Lists, Customer Needs Memorandums, Regulatory Filing Checklists, Quality Assurance Procedures and Manuals, and other strategic marketing, financial and sales documents, among other confidential company documents.

109.   MicroVention has developed its trade secrets over the course of many years, through a substantial financial investment of hundreds of millions of dollars, as well as through a significant investment in time, talent, and other resources. MicroVention's trade secrets and other proprietary technology allow it to efficiently and effectively design, produce, and bring to market cutting edge medical products for the treatment of neurovascular diseases in what is a highly competitive industry.

-34-

110.   MicroVention's trade secrets are not generally known and cannot be readily ascertained by others.  MicroVention derives substantial economic value from its trade secrets.  This economic value results precisely because its trade secrets are not generally known to the public or to others who could obtain economic value or a competitive advantage from using them.  MicroVention's trade secrets are kept secret because they provide MicroVention with a competitive advantage in the marketplace.

111.   MicroVention undertakes extensive efforts to protect and maintain the secrecy of its trade secrets.  As set forth herein, such efforts include, but are not limited to, maintaining controlled documents in password protected electronic databases with restricted access, using security software and audits to protect technology resources, using confidentiality legends on electronic and printed documents, maintaining printed documents in use in manufacturing processes and on production lines under lock and key, and restricting physical access to proprietary equipment and the computers that control the equipment through the use of passwords and to specified employees. MicroVention employees also receive instruction and training on the importance of maintaining the confidentiality of MicroVention trade secrets and are required to sign and abide by the Confidentiality Agreement that all must sign as a condition of employment.  Vendors, physicians, suppliers, and others working with MicroVention are required to sign NDAs.  MicroVention facilities are closed to the public.  Employees must scan their badges to enter MicroVention buildings, and security guards posted at the front entrance and on roving patrol require visitors to be escorted by an employee. Photography, video recordings, and cell phone use are restricted and/or prohibited.

112.   Despite MicroVention's extensive efforts to maintain the secrecy of its trade secrets, Defendants, and each of them, individually and/or in collaboration with one another, acquired through improper means, MicroVention's trade secrets. Defendants misappropriated MicroVention's trade secrets through theft and/or by acquiring MicroVention's trade secrets from individuals whom Defendants knew, or

had reason to know, owed a duty to MicroVention to maintain the confidentiality of this information.

113.   Defendants are currently using, and will continue to use, MicroVention's trade secrets for their own benefit and/or for the benefit of Balt both in the operation of Balt's business and in the design and development of Balt's medical products.  The trade secrets of MicroVention relate to the medical products of MicroVention and Balt that are used in, and intended for use in, interstate and foreign commerce within the meaning of 18 U.S.C. § 1836(b)(1).

114.   Defendants' acquisition and use of MicroVention's trade secrets has caused, and will continue to cause, great harm to MicroVention.  Such acquisition and use has provided Defendants with an unfair competitive advantage by, among other things:  (1) allowing Defendants to forgo the substantial investment of time and resources necessary to develop the trade secret processes and procedures, an investment that MicroVention made; (2) permitting Defendants to more quickly design, develop and bring to market competitive products through the use of MicroVention's trade secrets; and (3) allowing Defendants to build an entire business with competitive product lines based on technology and trade secrets stolen from MicroVention—a business which, within 5 years, was sold to an international conglomerate for over $42M.

115.   Each of the Individual Defendants, Ferrera, Le, Katayama, and Gong had access to MicroVention's trade secrets and other confidential and proprietary information during their employment with MicroVention.  Despite the extensive efforts undertaken by MicroVention to protect its trade secrets, and its other confidential and proprietary information, and in violation of their contractual and legal obligations to MicroVention, each of these former employees took and/or facilitated and encouraged the theft, misappropriation and use of MicroVention's trade secrets.  As a result, each of the Individual Defendants are independently and collectively responsible for the harm such actions have caused to MicroVention.

-36-

116.   Further, given the executive level positions held by Ferrera and Le while with MicroVention, without question both understood and appreciated the nature and value of the intellectual property they misappropriated from MicroVention and used for their own benefit and for the benefit of Balt.   Moreover, given the executive-level management positions held by Ferrera and Le at Balt, their actions and knowledge are implied and imputed to Balt.   Accordingly, Ferrera, Le and Balt's misappropriation and use of MicroVention's trade secrets was clearly willful and malicious.

117.   Katayama and Gong's misappropriation of MicroVention trade secrets and confidential and proprietary information was likewise willful and malicious.   Both Katayama and Gong were aware of their obligations to maintain the confidentiality of MicroVention trade secrets.   Despite acknowledging these obligations and certifying that she returned all MicroVention documents, on information and belief, Gong took MicroVention proprietary documents with her to Balt to use in her engineering work for Balt.   Katayama refused to certify his return of all MicroVention documents and instead, on information and belief, took trade secrets and confidential information with him to Balt.   Accordingly, Katayama and Gong's misappropriation and use of MicroVention trade secrets was willful and malicious.

118.   As a proximate result of their wrongful conduct, Defendants remain in possession of stolen MicroVention trade secrets and confidential and proprietary information.   Absent Court intervention, Defendants' conduct in misappropriating MicroVention's trade secrets, and other confidential and proprietary information, will continue and will result in great and irreparable harm to MicroVention's business. Because MicroVention has no adequate remedy at law for the injuries it is currently suffering, and will continue to suffer, as a result of Defendants' unlawful conduct, MicroVention seeks both preliminary and permanent injunctive relief to recover, preserve and protect its trade secrets and other legitimate business interests from their ongoing misappropriation and use by Defendants. *See, e.g.*, 18 U.S.C. § 1836(b)(3)(A) (authorization to grant injunctive relief).

-37-

119.   As a further direct and proximate result of the acts of Defendants as alleged herein, MicroVention has suffered, and will continue to suffer, damages in the amount of the actual losses caused by Defendants' misappropriation of trade secrets. *See, e.g.*, 18 U.S.C. § 1836(b)(3)(B)(i)(I) (authorization to award damages for actual loss caused by the misappropriation). In addition, 18 U.S.C. § 1836(b)(3)(B)(i)(II) permits MicroVention to recover for the unjust enrichment caused by Defendants' misappropriation to the extent such unjust enrichment is not addressed in computing damages for actual loss.  In the event Defendants have caused harm for which neither actual damages nor unjust enrichment can be established, 18 U.S.C. § 1836(b)(3)(B)(ii) entitles MicroVention to the payment of a reasonable royalty as compensation for such harm, and in an amount to be determined.  While the exact amount of damages suffered by MicroVention resulting from Defendants' misconduct will be proven at trial, on information and belief, such damages are likely to exceed one-hundred million dollars.

120.   Defendants' misappropriation of MicroVention's trade secrets has been knowing, willful, malicious, fraudulent, and oppressive.  Given the nature and severity of Defendants' intentional, willful, and malicious misconduct, injunctive or other equitable relief will be inadequate to prevent Defendants from engaging in future misconduct.  Accordingly, MicroVention seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of MicroVention's trade secrets and confidential or proprietary information and documentation in the possession, custody, or control of any of the Defendants in order to recover and protect MicroVention's trade secrets and other legitimate business information.

121. In light of the fact that Defendants willfully and maliciously misappropriated MicroVention's trade secrets and other proprietary and confidential information, MicroVention seeks recovery of its reasonable attorneys' fees and costs pursuant to  18 U.S.C. § 1836(b)(3)(D) and exemplary damages to the fullest extent permissible pursuant to 18 U.S.C. § 1836(b)(3)(C).

-38-

**SECOND CAUSE OF ACTION**

**(Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act ("CUTSA") – Cal. Civ. Code § 3426, *et seq.* - Against All Defendants)**

122.   MicroVention realleges and incorporates by reference paragraphs 1 through 121 above as though fully set forth herein.

123.   At all times relevant herein, MicroVention owned and was in possession of its trade secrets as specified herein and as defined by California Civil Code Section 3426.1(d).  As set forth herein, these trade secrets include a robust information system of policies, processes, and procedures prepared by MicroVention for use in its business. It includes, among other things, an interconnected library of controlled documents in which MicroVention records, in detail, its current projects, future plans, product designs, recipes, procedures, verification methods, test results, and other highly confidential trade secrets.  It also includes a sophisticated knowledge management system containing, among other things, regulatory compliance information, customer feedback, and competitive marketing, sales, and other sensitive business information.

124.   These trade secrets are reflected in MicroVention's Marketing Specifications, Design Specifications, Part Drawings, Manufacturing Procedures, Test Methods, Risk Assessment Plans, Test Protocols, Test Reports, Test Data, Process Validation Records, Build Records, Equipment Specifications, Tool Drawings, Approved Supplier Lists, Customer Needs Memorandums, Regulatory Filing Checklists, Quality Assurance Procedures and Manuals, and other strategic marketing, financial and sales documents, among other confidential company documents.

125.   MicroVention developed its trade secrets over the course of many years, through a substantial financial investment of hundreds of millions of dollars, as well as through a significant investment in time, talent, and other resources.  MicroVention's trade secrets and other proprietary technology allow it to efficiently and effectively design, produce, and bring to market cutting edge medical products for the treatment of neurovascular diseases in what is a highly competitive industry.

-39-

126.   MicroVention's trade secrets are not generally known and cannot be readily ascertained by others.  MicroVention derives substantial economic value from its trade secrets.  This economic value results precisely because its trade secrets are not generally known to the public or to others who could obtain economic value or a competitive advantage from using them.  MicroVention's trade secrets are kept secret because they provide MicroVention with a competitive advantage in the marketplace.

127.   MicroVention undertakes extensive efforts to protect and maintain the secrecy of its trade secrets.  As set forth herein, such efforts include, but are not limited to, maintaining controlled documents in password protected electronic databases with restricted access, using security software and audits to protect technology resources, using confidentiality legends on electronic and printed documents, maintaining printed documents in use in manufacturing processes and on  production lines under lock and key, and restricting physical access to proprietary equipment through the use of passwords and to specified employees.   MicroVention employees also receive instruction and training on the importance of maintaining the confidentiality of MicroVention trade secrets and are required to sign and abide by the Confidentiality Agreement that all must sign as a condition of employment.  Vendors, physicians, suppliers, and others working with MicroVention are required to sign NDAs.  MicroVention facilities are closed to the public.  Employees must scan their badges to enter MicroVention buildings, and security guards posted at the front entrance and on roving patrol require visitors to be escorted by an employee.  Photography, video recordings, and cell phone use are restricted and/or prohibited.

128.   Despite MicroVention's extensive efforts to maintain the secrecy of its trade secrets, Defendants, and each of them, individually and/or in collaboration with one another, acquired, through improper means, MicroVention's trade secrets in violation of California Civil Code Sections 3426.1(b).  Defendants misappropriated MicroVention's trade secrets through theft and/or by knowingly acquiring MicroVention's trade secrets from individuals whom Defendants knew, or had reason

-40-

1    to know, owed a duty to MicroVention to maintain the confidentiality of its trade secrets

2    and other confidential and proprietary information.

3           129.   Defendants are currently using, and will continue to use, MicroVention's

4    trade secrets for their own benefit and/or for the benefit of Balt both in the operation of

5    Balt's business and in the design and development of Balt's medical products.

6           130.   Defendants' acquisition and use of MicroVention's trade secrets has

7    caused, and will continue to cause, great harm to MicroVention.  Such acquisition and

8    use has provided Defendants with an unfair competitive advantage by, among other

9    things:   (1) allowing Defendants to forgo the substantial investment of time and

10   resources necessary to develop the trade secret products, processes and procedures, an

11   investment that MicroVention made; (2) permitting Defendants to more quickly design,

12   develop and bring to market competitive products through the use of MicroVention's

13   trade secrets; and (3) allowing Defendants to build an entire business with competitive

14   product lines based on technology and trade secrets stolen from MicroVention; a

15   business which, within 5 years, was sold to an international conglomerate for over

16   $42M.

17          131.   Each of the Individual Defendants, Ferrera, Le, Katayama, and Gong had

18   access to MicroVention's trade secrets and other confidential and proprietary

19   information during their employment with MicroVention.  Despite the extensive efforts

20   undertaken by MicroVention to protect its trade secrets, and its other confidential and

21   proprietary information, and in violation of their contractual and legal obligations to

22   MicroVention, each of these former employees took and/or facilitated and encouraged

23   the theft, misappropriation and use of MicroVention's trade secrets.  As a result, each

24   of the Individual Defendants are independently and collectively responsible for the

25   harm such actions have caused to MicroVention.

26          132.   Further, given the executive level positions held by Ferrera and Le while

27   with MicroVention, without question both understood and appreciated the nature and

28   value of the intellectual property they misappropriated from MicroVention and used for

  
their own benefit and for the benefit of Balt.   Moreover, given the executive-level management positions held by Ferrera and Le at Balt, their actions and knowledge are implied and imputed to Balt.   Accordingly, Ferrera, Le and Balt's misappropriation and use of MicroVention's trade secrets was clearly willful and malicious.

133.   Katayama and Gong's misappropriation of MicroVention trade secrets and confidential and proprietary information was likewise willful and malicious.   Both Katayama and Gong were aware of their obligations to maintain the confidentiality of MicroVention trade secrets.   Despite acknowledging these obligations and certifying that she returned all MicroVention documents, on information and belief, Gong took MicroVention proprietary documents with her to Balt to use in her engineering work for Balt.   Katayama refused to certify his return of all MicroVention documents and instead, on information and belief, took trade secrets and confidential information with him to Balt.   Accordingly, Katayama and Gong's misappropriation and use of MicroVention trade secrets was willful and malicious.

134.   As a proximate result of their wrongful conduct, Defendants remain in possession of stolen MicroVention trade secrets and confidential and proprietary information.   Absent Court intervention, Defendants' conduct in misappropriating MicroVention's trade secrets, and other confidential and proprietary information, will continue and will result in great and irreparable harm to MicroVention's business. Because MicroVention has no adequate remedy at law for the injuries it is currently suffering, and will continue to suffer, as a result of Defendants' unlawful conduct, MicroVention seeks both preliminary and permanent injunctive relief to recover, preserve and protect its trade secrets and other legitimate business interests from their ongoing misappropriation and use by Defendants.   *See, e.g.*, California Civil Code § 3426.2 (authorization to grant injunctive relief).

135.   As a further direct and proximate result of the acts of Defendants as alleged herein, MicroVention has suffered, and will continue to suffer, damages in the amount of the actual losses caused by Defendants' misappropriation of trade secrets.   *See, e.g.*,

COMPLAINT
Case No.

California Civil Code § 3426.3(a) (authorization to award damages for actual loss caused by the misappropriation).  In addition, California Civil Code Section 3426.3(a) permits MicroVention to recover for the unjust enrichment caused by Defendants' misappropriation to the extent such unjust enrichment is not accounted for in calculating damages for actual loss.  In the event Defendants have caused harm for which neither actual damages nor unjust enrichment can be established, California Civil Code Section 3426.3(b) entitles MicroVention to the payment of a reasonable royalty as compensation for such harm, and in an amount to be determined.  While the exact amount of damages suffered by MicroVention resulting from Defendants' misconduct will be proven at trial, on information and belief, such damages are likely to exceed one-hundred million dollars.

136.  In light of the fact that Defendants willfully and maliciously misappropriated MicroVention's trade secrets and other proprietary and confidential information, MicroVention seeks recovery of its reasonable attorneys' fees and costs pursuant to  California Civil Code Section 3426.4 and exemplary damages to the fullest extent permissible pursuant to California Civil Code Section 3426.3(c).

## PRAYER FOR RELIEF

**WHEREFORE**, MicroVention requests judgment in its favor and against Defendants, jointly and severally, as follows:

1.      On all claims for the relief herein alleged;

2.      For preliminary and permanent injunctive relief enjoining Defendants, their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from further misappropriation and/or unauthorized use of MicroVention's trade secrets;

3.      For an Order seizing all MicroVention trade secrets and confidential and proprietary technical or business information in the possession, custody, or control of any Defendant in order to recover and protect such information as permitted by 18 U.S.C. § 1836(b)(2);

4.     For an Order requiring Defendants to pay MicroVention the compensatory damages to which it is entitled, with interest at the highest rate allowable by law;

5.     For an Order requiring Defendants to disgorge all profits unjustly obtained through the use of MicroVention's trade secrets and to pay those profits to MicroVention, with interest at the highest rate allowable by law;

6.     For an Order requiring Defendants to pay MicroVention exemplary damages including, but not limited to, double the amount of compensatory damages awarded on account of Defendants' intentional, willful, and malicious misappropriation of MicroVention's trade secrets;

7.     For an Order requiring Defendants to pay MicroVention's reasonable attorneys' fees and allowable court costs and expenses; and

8.     For an Order granting MicroVention all other and further relief to which it is entitled at law or in equity, and as the Court deems just and proper.

Dated:  December 22, 2020

EVAN FINKEL
CALLIE A. BJURSTROM
MICHAEL S. HORIKAWA
CHAZ M. HALES
PILLSBURY WINTHROP SHAW PITTMAN LLP

By:_____/s/ Callie A. Bjurstrom_____
    Callie A. Bjurstrom
    Attorneys for Plaintiff
    MICROVENTION, INC.

-44-

COMPLAINT
Case No.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiff MicroVention, Inc. hereby demands a jury trial, as provided by Rule 38 of the Federal Rules of Civil Procedure, on all claims that are triable to a jury.

Dated:  December 22, 2020

EVAN FINKEL
CALLIE A. BJURSTROM
MICHAEL S. HORIKAWA
CHAZ M. HALES
PILLSBURY WINTHROP SHAW PITTMAN LLP

By:_____/s/ Callie A. Bjurstrom_____
    Callie A. Bjurstrom
    Attorneys for Plaintiff
    MICROVENTION, INC.

-45-