EVAN FINKEL (SBN 100673)
evan.finkel@pillsburylaw.com
MICHAEL S. HORIKAWA (SBN 267014)
michael.horikawa@pillsburylaw.com
CHAZ M. HALES (SBN 324321)
chaz.hales@pillsburylaw.com
CHLOE STEPNEY (SBN 334013)
chloe.stepney@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:  213.488.7100
Facsimile:  213.629.1033

CALLIE A. BJURSTROM (SBN 137816)
callie.bjurstrom@pillsburylaw.com
MICHELLE A. HERRERA (SBN 209842)
michelle.herrera@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone:  619.544.3107
Facsimile:  619.236.1995

Attorneys for Plaintiff
MICROVENTION, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICROVENTION, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BALT USA, LLC, a Delaware Limited Liability Company; DAVID FERRERA; NGUYEN "JAKE" LE; YOSHITAKA KATAYAMA; STEPHANIE GONG AND MICHELLE TRAN,<br><br>Defendants. | Case No.  8:20-cv-02400-JLS-KES<br><br>PLAINTIFF MICROVENTION, INC.'S SECOND AMENDED COMPLAINT FOR: (1) MISAPPROPRIATION OF TRADE SECRETS UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. §1836 *ET SEQ.*; (2) MISAPPROPRIATION OF TRADE SECRETS UNDER CAL. UNIFORM TRADE SECRETS ACT, CAL. CIV. CODE §3426, *ET SEQ.* AND (3) BREACH OF CONTRACT<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Josephine L. Staton<br>Courtroom:      10-A |

Plaintiff MicroVention, Inc. ("MicroVention"), by and through its attorneys, brings this Complaint against Defendants Balt USA, LLC ("Balt"), David Ferrera, Nguyen "Jake" Le, Yoshitaka Katayama, Stephanie Gong, and Michelle Tran, and alleges as follows:

## JURISDICTIONAL STATEMENT UNDER L.R. 8-1

1.     This is a civil action seeking monetary damages and injunctive relief for, *inter alia*, misappropriation of trade secrets.  This Court has federal question subject matter jurisdiction under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq*.  This Court has original jurisdiction over the claims alleged herein under the DTSA pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the claims alleged herein arising under state law pursuant to 28 U.S.C. § 1367(a).

## THE PARTIES

2.     Plaintiff MicroVention, Inc. ("MicroVention") is a Delaware corporation having its principal place of business in Aliso Viejo, California.

3.     On information and belief, Defendant Balt USA, LLC ("Balt") is a Delaware limited liability company principally engaged in the design, manufacture, and sale of medical devices and having its principal place of business in Irvine, California.

4.     On information and belief, Defendant David Ferrera ("Ferrera") is an individual residing in Orange County, California, and is a founder of Balt's predecessor company, Blockade Medical, LLC ("Blockade").  Ferrera is the former President and Chief Operating Officer of Balt.  Ferrera was formerly employed by MicroVention, first as its Senior Research and Development Manager and later as its Director of Clinical Research.  On information and belief, Ferrera is currently a General Partner at Quantum Fund OC, LLC, an Orange County-based investment firm providing funding, as well as manufacturing and managerial support to startup and early-stage companies developing catheter-based diagnostic and interventional radiology technology products similar to the products sold by both MicroVention and Balt.

-2-

5.      On information and belief, Defendant Nguyen "Jake" Le ("Le") is an individual residing in Orange County, California, and is Balt's current Director of Research and Development.  Le was formerly employed by MicroVention as a Senior Research and Development Engineer.

6.      On information and belief, Defendant Yoshitaka Katayama ("Katayama") is an individual residing in Orange County, California and is Balt's current Process Engineering Manager.  Katayama was formerly employed by MicroVention as a Senior Process Development Engineer and Engineering Manager.

7.      On information and belief, Defendant Stephanie Gong ("Gong") is an individual residing in Orange County, California, and is currently employed as a Research and Development Engineer II by Balt.  Gong previously spent four summers employed by MicroVention as an engineering intern working on research and development projects.

8.      On information and belief, Defendant Michelle Tran ("Tran") is an individual residing in Orange County, California and is Balt's current Director of Research and Development, Access Technologies.  Tran was formerly employed by MicroVention as a Senior Project Manager, Research and Development.

9.      On information and belief, at all times mentioned herein, each and every Defendant was the agent, servant, employee, and/or co-conspirator of each other Defendant, and that, in performing or failing to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, and/or conspiracy, and each other Defendant ratified and affirmed the acts and omissions of the other Defendants. On information and belief, each Defendant, in taking the actions alleged herein and/or in ratifying the actions alleged herein, acted within the course and scope of such authority and/or employment and, at the same time, for their own financial and individual advantage.

10.     Whenever, as alleged herein, reference is made to any actions of Balt, such allegations shall mean that the directors, officers, employees and/or agents of Balt did perform or authorize the alleged acts or actively engaged in the management, direction and/or control of Balt and were acting within the course and scope of their employment in doing so.  Whenever reference is made to any actions of Ferrera, Le, Katayama, Gong, Tran, or any other person who is or was an employee or agent of Balt, such allegations shall also mean Balt, acting by and through said individual.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendants, and each of them, because they each reside in this judicial district, transact substantial business in and maintain continuous and systematic contacts with this judicial district and the State of California, and have committed tortious acts that they knew or should have known would cause injury to MicroVention in this judicial district, all as further alleged herein.

12.     This Court has federal question subject matter jurisdiction under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836.  This Court has original jurisdiction over the claims alleged herein under the DTSA pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the claims alleged herein arising under state law pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this district under 28 U.S.C. § 1391 because (1) the Defendants, and each of them, reside in this judicial district and the State of California, and (2) a substantial part of the acts, events, omissions and injuries giving rise to the claims complained of herein have occurred and are occurring in this judicial district.

## GENERAL ALLEGATIONS

**A.     MicroVention and its Products**

14.     MicroVention is an innovative medical device company founded in Southern California in 1997 to improve the treatment of diseases in small blood vessels. MicroVention's first commercial product was a line of platinum "microcoil" implants used to treat brain aneurysms.  MicroVention's microcoil implants were approved for

-4-

1   use in 2001.  A brain aneurysm is a weak or thin spot on a blood vessel wall in the brain
2   that balloons out and fills with blood.  When a brain aneurysm bursts, blood spills into
3   the surrounding brain tissue.  Without medical intervention, the accumulating blood
4   compresses the surrounding tissue, depriving brain cells of necessary oxygen and
5   causing cell and tissue damage.  This is a life-threatening condition called a
6   hemorrhagic stroke that affects more than one hundred thousand Americans each year.

7     15. One way to treat a brain aneurysm before it bursts is to deliver tiny metal
8   coil implants into the aneurysm, to fill the aneurysm.  This prevents new blood flow
9   into the aneurysm, which eventually causes the existing blood inside the aneurysm to
10  clot (a process called embolization).  In order to deliver these microcoil implants to an
11  aneurysm, a surgeon will insert a catheter into the patient's artery and use angiography
12  to guide the catheter through the artery and to the site of the aneurysm in the brain.
13  Once the catheter is in place, the surgeon delivers the implant to the aneurysm by
14  pushing the implant through the catheter using a specialized delivery device called a
15  "pusher."  Each implant comes pre-attached to the end of its own long flexible pusher.
16  When the surgeon has properly positioned the implant in the aneurysm, she detaches
17  the implant from the pusher and then withdraws the pusher, leaving the implant inside
18  the aneurysm.  Some aneurysms may require as many as 30 implants to be successfully
19  treated.

20    16. Both coil implants and the delivery system used to deliver the implants to
21  the aneurysm are relatively new technologies.  The use of microcoil implants to treat
22  brain aneurysms was first developed by doctors at the University of California at Los
23  Angeles in the early 1990s, just a few years before MicroVention was founded.  These
24  first coil implants were detached in the patient using "electrolytic detachment," a
25  process whereby a chemical reaction causes the connection between the implant and the
26  pusher to slowly dissolve into the patient's bloodstream over a period of minutes.

27    17. Rather than using the same electrolytic detachment technology as others,
28  MicroVention designed and developed a new innovative detachment technology for the

-5-

delivery of microcoil implants to treat brain aneurysms.  In 2002, MicroVention released the MicroPlex Coil System, which included the HydroLink Detachment mechanism that used hydraulics to open a microscopic mechanical valve to release the microcoil implant from the pusher.

18.     Since then, MicroVention has maintained a steady drumbeat of new and innovative product offerings.  In 2005, MicroVention replaced its HydroLink delivery system with V-Trak, a much faster and more user-friendly device.  V-Trak uses MicroVention's patented "thermo-mechanical" detachment, where the microcoil implant is connected to the pusher by a small pre-tensioned tether that is severed by a tiny electric heater built into the far end of the delivery pusher.  Improvements made to V-Trak resulted in the release of V-Trak Advanced in 2014.  In both the V-Trak and V-Trak Advanced delivery systems, the surgeon detaches the implant in the patient by pressing a button on a small, handheld power source called the V-Grip.

19.     MicroVention has also made continuous improvements to its microcoil product line.  Expanding beyond its initial offering in 2002 of platinum Complex and Helical coils, MicroVention developed and marketed its extra soft filling and finishing coils (HyperSoft (2005); HyperSoft 3D (2013)), its framing coils useful in a wide variety of aneurysms shapes (Cosmos Framing Coil (2008)), its hydrogel-infused coils consisting of a water-swollen polymeric material that helps fill space in an aneurysm (HydroCoil (2006); HydroSoft (2007); HydroFrame & HydroFill (2009)), and its specialty coils for better expansion into uniquely shaped aneurysms (VFC (2010)).  This varied and growing family of embolic coils developed and offered by MicroVention, has allowed the company to better serve its customers and the patients they treat.  It has also allowed MicroVention to expand beyond the treatment of cerebral aneurysms to, among other things, the treatment of neurovascular malformations which are abnormal connections between blood vessels that disrupt regular vascular blood flow in an area of the brain.

20.    Stents can also be used in the treatment of an aneurysm to reenforce the structure of the artery at the aneurysm site and to help keep the microcoil implants secure inside the aneurysm.  MicroVention has developed a line of "coil-assist stents" for use in such procedures (LVIS & LVIS Jr. (2014, 2018)).

21.    MicroVention has also developed alternate devices called flow diverters, used in treating certain sizes of brain aneurysms.  (FRED (2012, 2020); FRED Jr. (2015)).  A flow diverter is a tightly braided mesh tube placed in the artery to cover the aneurysm opening, extending into the artery on both sides of the aneurysm.  Once blood flow is altered by the diverter so that it no longer flows into the aneurysm, the aneurysm shrinks in size, reducing the risk of rupture and hemorrhagic stroke.

22.    Not content to have surgeons deliver MicroVention treatment devices through other companies' catheters, MicroVention embarked on the development and production of its own catheters and access products.  MicroVention brought to market various sizes of catheters that are routed to the treatment site and through which the treatment devices are delivered.  MicroVention's intermediate catheters (SOFIA (2014); SOFIA Plus (2015)) provide stability during delivery of implantable medical devices, thereby reducing any movement or "kickback" that can occur upon detachment.  Microcatheters (Headway (2008, 2009, 2012)) are the smallest diameter catheters which route microcoil implants to the aneurysm site.  And finally, balloon catheters (Scepter C (2011); Scepter XC (2012)) include a small inflatable balloon at the tip that expands during a procedure to assist in device delivery, to reshape parts of the blood vessels, or to assist during the injection of liquid embolics (PHIL (2014) (not available in the U.S.)).

23.    In addition to its expansive and growing product line for the treatment of brain aneurysms, MicroVention has also invested its time, talent, and resources into developing treatments for other neurovascular diseases such as ischemic stroke and carotid artery disease.  Ischemic stroke, caused by a blood clot in an artery that disrupts the flow of blood to the brain, impacts nearly 700,000 Americans each year.  Ischemic

stroke can be treated by removing the blood clot from inside the artery using an aspiration catheter. MicroVention designed and developed its own aspiration catheter and in 2018 launched the highly successful SOFIA Flow Plus with an aspiration indication to market. Carotid artery disease is a narrowing of the arteries that provide blood flow to the brain, typically by the buildup of plaque on the artery walls, possibly causing an ischemic stroke. Although not available in the United States, MicroVention developed the CASPER (2014), a stent that can be inserted into the artery to widen it, providing support for the blood vessel, and restoring blood flow to the brain.

24.     In the 23 years since its founding, MicroVention has designed, developed and brought to market more than 30 innovative new medical device products—products used to treat patients in the United States and around the world who are suffering from neurovascular diseases and other neurovascular challenges.

**B.      The Technical and Regulatory Challenges that Accompany Innovation and the Persistence and Resources Required to Overcome Them**

25.     Innovating in the cutting-edge medical field of neurovascular diseases presents enormous challenges. MicroVention's treatment devices are each small enough to pass through the blood vessels of the human body and are made of even smaller sub-components, some no bigger than a human hair. The technical design and precision manufacturing on this tiny scale are exceptionally challenging. The materials from which these life-saving devices are made must be both durable and bio-compatible. Physician preferences change as new devices are brought to market. The medical device market is a highly competitive market. Extensive and costly research and development, including extensive trial and error testing, is both necessary and unavoidable when creating new and improved devices and/or in delivering new treatment options. Considerable knowledge is gained through this research and development process about what works and what does not.

26.     Take, for instance, catheter products such as MicroVention's Headway and SOFIA. While the physical construction of a catheter—that is, how to make a long,

flexible tube—is generally understood in the medical device industry, a key differentiator in the performance of catheters are their hydrophilic coatings. Hydrophilic coatings are made of polymers that bind to the surface of the catheter and absorb water, thus binding the water to the catheter itself. The catheter surface becomes smooth and slippery, reducing friction and making deployment through a patient's blood vessels easier and safer. Two different coatings used on the same catheter can result in significantly different performance.

27. Hydrophilic coatings are notoriously difficult to perfect because the coating does not naturally stick to the catheter's surface. A well-known technique called "plasma treatment" is used to clean and chemically activate the catheter surface, so the coating sticks. However, if the plasma treatment recipe is inadequate, the coating may flake off in use, a disastrous result which can cause pieces to embolize in the patient's blood creating clots where they land. Also, if the high-tech coating process is performed incorrectly, physical damage to the catheter may result.

28. The importance of catheter coating durability is underscored by the fact that it was the subject of the largest medical device recall in history. In 2016, Cook Medical recalled 4.1 million Beacon Tip catheters because they had been found to exhibit polymer degradation resulting in fractures or separation of the catheter tip. In 2016 and 2017, the FDA sent teams of auditors to most major device manufacturers to perform extensive "Critical to Quality" audits of their hydrophilic coating processes.

29. MicroVention worked for almost a year to create its own proprietary, trade secret hydrophilic coating recipes with the requisite lubricity and durability for its catheter products. Considerable testing went into uncovering the right combination of materials for both the catheter and the coating, and into identifying the right combination of gas, time, temperature, and pressure for use in the plasma treatment process. With every tweak of a recipe, the entire development process begins again. Without question, MicroVention's highly successful hydrophilic coating recipes are a valuable and closely guarded trade secret. It is used on MicroVention's catheter

-9-

SECOND AMENDED COMPLAINT
Case No. 8:20-cv-02400-JLS-KES

products including, among others, MicroVention's commercially successful Headway, SOFIA, and Scepter catheters.  These catheter products collectively generate more than $100M in revenue each year for MicroVention.

30.     Technical challenges are just one hurdle to successfully bringing a medical device product to market.  Understanding how to navigate the labyrinth of regulations that govern the use and marketing of medical devices in the United States and around the world can be daunting.  In the United States, the FDA categorizes medical devices into one of three classes (I, II, or II), based on the degree of risk they present to patient safety.  MicroVention's products span classes II (e.g., catheters and microcoils) and III (e.g., coil-assist stents and flow diverters).

31.     Just as risk rises from one class to another, so does the regulatory control to which the devices are subject.  Class II devices that present "moderate" risk may be sold upon clearance of a 510(k) Premarket Notification that demonstrates the new device is "substantially equivalent" to a predicate device that has already received clearance.  Class III devices that present "higher" risk require a more stringent premarket submission called a Premarket Approval ("PMA").  Before the FDA approves a PMA, the applicant must provide valid scientific evidence demonstrating reasonable assurances of safety and effectiveness for the device's intended use.

32.     Securing FDA clearance or approval for a new or improved medical device is a back-and-forth exchange between the applicant and the FDA that can take a significant period of time.  For example, following submission of a 510(k), an applicant can expect to wait up to 90 days for the FDA's response.  The first response is typically a series of questions or requests for additional information.  The resulting back and forth of providing information and answering follow-up questions can take several months.  Significant knowledge is gained from this process.  Knowing what the FDA expects to see and which materials or processes are likely to be cleared or approved quickly is extremely valuable information.  It saves time and effort, resulting in products being brought to market more quickly.

-10-

## C. MicroVention's Proprietary Document Control System

33. Successfully bringing one medical device product to market is difficult. Successfully launching over 30 medical device products, as MicroVention has done, requires the development and implementation of a sophisticated organizational structure which catalogues, in detail, the company's product designs and development processes, its research and development efforts, and its test results, among other things. It also requires a sophisticated knowledge management system directed at regulatory compliance, customer feedback, and marketing, as well as other business practices that can position the company for success in a highly competitive industry.

34. MicroVention developed, over many years, a robust system of policies, processes, and procedures designed to guide the company and streamline its business. This includes an interconnected library of controlled documents in which MicroVention records, in detail, its current projects, future plans, product designs, recipes, procedures, verification methods, test results, and other highly confidential trade secret information. In one sense, these documents *are* MicroVention.  In these controlled documents, MicroVention captures the hard-earned lessons learned for future use.  The documents are updated to reflect design changes made in response to customer feedback, to add new features, or to design around common failure modes.  In an industry where knowing what does not work is just as valuable as knowing what does, a collection of proprietary documents reflecting time-tested knowledge is worth tens of millions if not hundreds of millions of dollars in time and cost savings.  These controlled documents detail not just how to design, develop, test, and gain regulatory approval for specific medical devices, but how to create and operate a successful medical device company.

35. The following sections illustrate a typical product life cycle and the value of these proprietary controlled documents.

### 1. MicroVention's Marketing Specification

36. A MicroVention product begins with a Marketing Specification that reflects what customers want in a new medical device.  This controlled document

-11-

1   describes, at a relatively high level, the intended uses of the device, the intended users,

2   and in which countries the device should be sold.  It also lists the key performance

3   criteria that MicroVention believes will make the medical device successful.  At this

4   stage, the performance criteria are a mix of qualitative criteria gleaned from interviews

5   with potential customers and quantitative criteria to ensure compatibility with other

6   medical device products currently on the market.  For example, physicians may request

7   that a new microcoil line be "stiffer" or "softer" than currently available options, or that

8   the maximum outer diameter of the microcoil and delivery system be of a certain size

9   to be compatible with catheters currently on the market.  Marketing Specifications also

10  include an analysis of the competitive landscape into which the new product must fit,

11  including assessments of competitors' offerings, forecasts for the target market, pricing

12  strategy, sales forecasts, and sales launch strategy.  Marketing Specifications, in

13  essence, pull together technological intelligence on the needs of target customers and

14  business intelligence about the anticipated commercial acceptance and success of the

15  new device.  Marketing Specifications are highly confidential because they contain

16  technical and business information gathered at great expense to MicroVention and not

17  publicly known, including information about which products might (or might not) be

18  successful in the market based on interviews with current and prospective customers.

19  Armed with a Marketing Specification, a competitor would be able to avoid both the

20  costs and time delay associated with performing its own research and could instead

21  piggyback on MicroVention's efforts and investment to identify market needs.

22              **2.     MicroVention's Design Specification**

23              37.     The Design Specification is MicroVention's top-level controlled

24  document that sets forth the detailed specifications for a MicroVention medical device.

25  Creating the Design Specification is a time and resource intensive process.  The Design

26  Specification covers every aspect of a device.  It specifies product dimensions,

27  component materials, sterility, shelf-life requirements, how the device will be

28  introduced into the patient's body, biocompatibility, and even packaging and labeling.

-12-

38.     Creating a Design Specification is an iterative process that can take hundreds of hours to define just one design value or performance parameter.   To illustrate, physicians may be enlisted to use early prototype products or models and provide feedback on the qualitative features of the product, such as how it "feels" while in use.  That feedback is then translated into the numerical specifications set forth in the Design Specification which will later guide the manufacturing process for that product.

39.     Creating a Design Specification can also involve hundreds of hours of testing, and dozens of failed attempts, to specify the right materials or component parts. Similar materials can behave differently in use, revealing that one material is suitable for a particular product or use and another is not.

40.     The Design Specification also sets forth the test methods to be used in verifying compliance with processes and regulations and references dozens of other controlled documents that drill down on various aspects of the design for a new medical product.

41.     The Design Specification is, at its core, a highly confidential, proprietary roadmap that captures the entire design process.  It captures the lessons learned through countless hours of trial and error and establishes the "winners" resulting from that process as the standards to which the product will be built.   Having, in hand, MicroVention's Design Specifications would provide a competitor with a significant competitive advantage.  That competitor could avoid the time-intensive and expensive design process, skipping directly to specified dimensions, processes, materials, and components, among other things, that have been tested and that are known to work. Without question, designing competitive products would be much easier, faster, and cheaper with access to, and the use of, MicroVention's highly confidential Design Specifications.

### 3.     MicroVention's Prototype Documents

42.     Prototype devices are built and tested based on the Design Specification. Testing of prototype devices leads to design changes and updates to the Design

-13-

Specification.  As this iterative process moves forward, a final product emerges that meets the requirements of the Design Specification.  As part of this phase, MicroVention creates several groups of confidential, controlled documents in parallel: Part Drawings, Manufacturing Procedures, Test Methods, and Risk Assessment Plans.

43.   MicroVention engineers create Part Drawings using Computer Aided Design (CAD) software such as SolidWorks.  These are scaled drawings that specify the dimensions of each part to be constructed and the materials from which the parts should be made.  Manufacturing parts with exactness, particularly a large number of parts, is impossible, so Part Drawings also include tolerances for each dimension, i.e., how much a part dimension is allowed to deviate from the exact dimension.  Knowing part tolerances is critical to ensuring that the various manufactured component parts can be successfully assembled resulting in a final assembled device that is the appropriate size and compatible for use with other parts of the device.

44.   Part Drawings also specify inspection methods for use during prototype development to verify that the part meets the specifications called out in the drawing. During early design development, there may be significant changes from one iteration of a Part Drawing to the next, but as the design draws closer to the finished product, the changes become more subtle.  Ultimately, the Part Drawings are assigned a release number as the part design is finalized and ready for manufacture.

45.   A finished MicroVention product may require dozens of different Part Drawings, ranging from the smallest individual component to those at the assembly level which demonstrate how the components fit together.  The detailed information contained in Part Drawings is not public information or generally known and cannot be determined by inspecting the final product.  Given the microscopic scale of some of MicroVention's finished products, many of the product components can only be accessed, if at all, through destructive testing which would significantly distort their shape and dimensions thereby causing any measurements pertaining to these components to differ from what is specified on the Part Drawings.  A competitor with

-14-

access to MicroVention's Part Drawings would quite literally have the blueprint for making an identical copy of MicroVention's products.

46.     Manufacturing Procedures are controlled documents that provide detailed, step-by-step instructions for production line workers and operators for carrying out a specific manufacturing task.   As such, these controlled documents are highly confidential and proprietary because they capture the best-known way of accomplishing a given task, discovered through painstaking trial and error.   One may outline, for example, precisely how to solder electrical wires to a heater coil or connect two subassemblies using a specified adhesive.   Another may detail specifically how hard to pull on a component piece (as measured by a force gauge) or exactly how to tie a particular knot.

47.     Manufacturing Procedures often contain photographs of each required step in the manufacturing process to illustrate for the operators what to do and how to do it, as well as common errors to avoid.   They list the safety requirements for the task and the required level of training for the operators.   Manufacturing Procedures also list the tooling and equipment required to implement the manufacturing process, including the use of specialty or custom tools and machines made in-house by MicroVention. Moreover, Manufacturing Procedures oftentimes cross-reference other Manufacturing Procedures related to the products under production.

48.     After the manufacturing process is complete, Manufacturing Procedures describe how to perform a quality control inspection and delineate exactly how to perform any rework that is required.

49.     During the early research and development or prototyping stage, Manufacturing Procedures change frequently as the design of the product evolves and kinks in the manufacturing process are worked out.   Most Manufacturing Procedures are revised multiple times, and the revision history for any given manufacturing process is both confidential and highly proprietary given the valuable information it provides in terms of operator feedback and lessons learned throughout the process.

-15-

50.    Test Methods are used to verify that medical devices in production conform to their specifications.  These controlled documents are highly proprietary and extremely valuable because products may be tested and verified for use in many different ways.  The exact Test Method chosen results from analyzing the pros and cons of different methods, including suitability for purpose, ease of implementation, repeatability, cost, and reliability.  For these reasons, Test Methods are not intuitive simply by looking at the finished product.

51.    Further, the Test Methods appropriate for novel medical devices like those produced by MicroVention, often require similarly novel approaches that are not generally known or readily ascertainable by others.  MicroVention independently develops Test Methods for each of its products, specifying the exact equipment and materials required, the standards that must be met, the exact steps required to execute the Test Methods and the order of execution, and the presentation and documentation of test results.  Thus, Test Methods reflect the results of hundreds of hours of experimentation to identify what works—experimentation that is often repeated multiple times.

52.    The FDA requires that all Test Methods be validated.  Medical device manufacturers like MicroVention must demonstrate to the FDA, with extensive documentation, that the specific Test Method used to verify product performance is suitable for that purpose.  The uncertainty inherent in a Test Method must also be disclosed.  Although the FDA may issue guidance on which Test Methods it wants manufacturers to employ, more often the choice is left to the manufacturers.  As a result, Test Methods are independently developed through significant investment of time, talent, and resources.

53.    Obtaining validation of Test Methods by the FDA is a substantial undertaking, the results of which are not shared among competitors.  Because the FDA primarily leaves to manufacturers, like MicroVention, the job of independently developing and validating Test Methods to verify product performance, a competitor

-16-

with access to MicroVention's FDA approved Test Methods would gain a tremendous advantage in the development process, particularly if those Test Methods are for copycat products, thereby allowing them to bypass the time and expense necessary to develop their own Test Methods.

54.     Moreover, test data and results documented in controlled Test Methods can also form the basis for product marketing claims—claims that tout the device's performance and reliability.  Because Test Methods are unknown to one's competitors, MicroVention's competitors do not know whether their own competitive devices may be less reliable than MicroVention's device or whether they are simply being tested in slightly different ways.  Subtle unknown differences in the Test Methods used to test functionally comparable products can lead to different performance data and, therefore, different marketing claims.  In this way, Test Methods also contain business intelligence that is useful to sales and marketing strategies.  A competitor with access to MicroVention's Test Methods would, therefore, have an unfair advantage in positioning its products to compete with MicroVention's products in the marketplace.

55.     MicroVention also creates Risk Assessment Plans at the start of the prototype development process for any new medical device.  The mitigation of risk is critical to the successful development and deployment of medical products.  As risks are characterized, understood, and mitigated through new processes and designs, high-risk concepts are gradually turned into acceptable products that can be brought to market.  The understanding of risk, as captured in the Risk Assessment Plan, is fundamental in the medical device industry.

56.     Risk Assessment Plans reflect MicroVention's catalogued historical experience designing and developing medical devices.  In effect, Risk Assessment Plans are the institutional memory of product development.  Risk Assessment Plans can include feedback on product use and experience that led to product changes and improvements.  They may reflect slight or significant differences between anticipated failure rates and modes and the failure rates and modes experienced while the device is

-17-

in actual use.  Risk Assessment Plans capture not only changes necessary to bring a product to market, but also changes and improvements to existing products that drive commercial success.

57.     The importance of risk assessment documentation is underscored by the fact that the FDA mandates that such documentation be kept and updated.  As an integral part of the design and development of new medical device prototypes, MicroVention creates and updates its Risk Assessment Plans to reflect new test data, developments, and updated risk assessments.  MicroVention's Risk Assessment Plan controlled documents reflect a vast wealth of information that is critical to its business and of immense value in the design and development of new medical devices.  These controlled documents are kept confidential and for good reason, as a competitor with access to MicroVention's Risk Assessment Plans could sidestep many of the hurdles and challenges in product development thereby avoiding the corresponding investment of research and development dollars and reducing their time to market with competing products.

### 4.     MicroVention's Design Verification & Process Validation

58.     Eventually, the iterative prototyping process yields a product design that meets the extensive list of requirements captured in the Design Specification.  Design Verification reflects a thorough review of the resulting product design and the corresponding test data that demonstrates compliance with the Design Specification. Once Design Verification has been approved by MicroVention representatives from key departments such as engineering, quality control, marketing, and operations, the new product design is effectively locked.

59.     Process Validation plays a similar role but is focused on finalizing the processes and Manufacturing Procedures that will be used to make the product once it enters production.  The Risk Assessment Plan documents are updated to incorporate everything learned throughout the design and prototype development phase.  When Design Verification and Process Validation are complete, it can be said that the new

medical device has been created.   The controlled documents from the Design Specification through Process Validation are collectively referred to as the Design History File, which must be submitted to the FDA as part of the regulatory approval process for any new product.

### 5.   MicroVention's Manufacturing and Production Documentation

60.   Once FDA clearance or approval is received, manufacturing resources are organized, and production of the approved medical device begins.   Controlled documents such as Build Records, Equipment Specifications, and Tool Drawings, among others, play a critical role in the manufacturing and production process.

61.   MicroVention's Build Records detail exactly how to make their medical devices.   Where Manufacturing Procedures provide detailed instructions to operators for completing a particular step in the manufacturing process, Build Records detail all the required steps and the order in which they must be completed.   To illustrate, a Build Record may list 20 or more major steps involved in manufacturing a given product, beginning with the issuance of a work order, and culminating in a quality control inspection protocol.   The Build Records specify, for each step, the specific Manufacturing Procedures and Part Drawings involved along with detailed, step by step instructions on how to build the device.

62.   As with Manufacturing Procedures, the various revisions made to Build Records capture changes to the overall manufacturing process based on MicroVention's lessons learned.   Build Records also contain a Bill of Materials for the product being manufactured.   The Bill of Materials specifies exactly what materials to use in making the device.

63.   Further, given that each step in the manufacturing process must be signed off on by the operator who performed the step, and given that these sign offs are recorded in the Build Records, these controlled documents provide an auditable paper trail in connection with the building of each MicroVention medical device.   This allows

1  for problems discovered during the quality control process to be properly investigated,

2  resolved, and documented.

3      64.    Possession of MicroVention's highly proprietary, confidential Build

4  Records would provide any competitor with a precise roadmap for building

5  MicroVention products.  When paired with the Manufacturing Procedures and Part

6  Drawings listed on the Build Record, a competitor would know exactly how each

7  MicroVention product is made—and how to copy those products.

8      65.    Key to the manufacturing process, and almost as important as the

9  controlled documents that detail the design and development of the medical devices

10 themselves, are the MicroVention controlled documents that identify and describe the

11 equipment and tools used by MicroVention in its manufacturing process.  It is one thing

12 to know how to make a product; it is quite another to know how to construct a machine

13 that automates or facilitates that product's manufacture.

14     66.    Equipment Specifications are the equivalent of Design Specifications for

15 the equipment used by MicroVention to manufacture its products.  They describe the

16 purpose and use of each piece of equipment, how the equipment is to be calibrated,

17 operated, and maintained, and identify the other controlled documents relating to the

18 equipment, such as the Tool Drawings and Qualification documents.

19     67.    While MicroVention does purchase from third parties some equipment

20 used to manufacture its products, most of the equipment used by MicroVention in the

21 manufacturing process is equipment it designed and built in-house.  Whether purchased

22 or developed in-house, the equipment used in MicroVention's manufacturing process

23 must conform to the Equipment Specification, as well as to equipment verification

24 procedures knowns as IQOQs (short for Installation Qualification Operational

25 Qualification).  IQOQs establish the standards for verifying that a piece of equipment

26 has been properly installed and is operating correctly.

27     68.    The Equipment Specification controlled documents reflect important

28 insights into MicroVention's confidential and proprietary manufacturing processes.

-20-

This is true whether the equipment specified is purchased off-the-shelf from a third party or developed in-house.  With equipment purchased from third parties, the actual equipment purchased and from which manufacturer can lead to important information concerning the identification of compatible equipment.   As for manufacturing equipment built in-house, the Equipment Specifications, Equipment Drawings, and Tool Drawings associated with the equipment are of critical importance.   The Equipment and Tool Drawings provide the exact plans and instructions for building specialized, custom equipment used in the manufacture of MicroVention's products.  This equipment itself is kept secret and is not made available for public view or access.

69.     None of the information about the equipment used to build MicroVention's medical device products can be determined simply by looking at the finished product.  As with the design of MicroVention's medical products, the design and development of the manufacturing equipment and tools to make those products is iterative, requiring testing and refinement before the right equipment and tool designs are identified and perfected.   Many medical device companies outsource equipment design and fabrication because of the considerable time and expense involved with that process.

70.     MicroVention devotes substantial time and resources to designing, building, and refining its proprietary manufacturing equipment and tools.  One of the primary reasons it does so is to protect the confidential and proprietary nature of MicroVention's manufacturing processes which it considers to be its valuable trade secrets.  Maintaining the confidentiality of the Equipment Specifications, Equipment Drawings, and Tool Drawings for equipment and tools developed in-house by MicroVention is essential to protecting the confidentiality of these manufacturing processes and the considerable investment that MicroVention has made in the development of its business.   Having access to MicroVention's Equipment Specifications, Equipment Drawings, and Tool Drawings would provide a competitor with invaluable information about how to efficiently build the machines and tools necessary to build and scale competitive, copycat products.

-21-

### 6.      Other Proprietary Controlled Documents

71.      In addition to the controlled documents set forth above, MicroVention maintains many other files and types of controlled documents depicting important and detailed information critical to the design and manufacture of its products and to the operation of its business.  Examples of these documents include Regulatory Strategy and Submission Checklists, Design and Development Project Plans, Design Review Approval Forms, Quality Plans, Customer Needs Memorandums, Receiving Specifications, Test Reports, Quality Assurance Procedures, Quality Specifications, Preventative Maintenance documents, and Approved Supplier Lists.

**D.      The Safeguarding of MicroVention Trade Secrets and Confidential Information**

72.      As illustrated above, the proprietary, trade secret information that is the core of MicroVention's business is contained in its vast interconnected library of controlled documents.  This contains both the technical documentation discussed above, as well as an extensive knowledge management system that includes regulatory compliance information, customer feedback, and sales and marketing information.  This highly confidential, proprietary information is entrusted to MicroVention employees who require access to such controlled information to do their jobs.

73.      MicroVention invests heavily in the development and training of its work force, emphasizing the importance of confidentiality in every aspect of the company's business.  Employees are trusted with its most valuable assets—the proprietary design and manufacturing information and the knowledge management system upon which MicroVention's business is built.

74.      From its inception, MicroVention has undertaken significant efforts to safeguard the confidentiality of its controlled documents, as well as its other confidential and proprietary information.   The sophistication of these protections progressed as technology evolved and as the company grew.

-22-

75.     MicroVention controlled documents reside in electronic databases with restricted access.  An authorized employee must log in to the system using a password protected account.  Multiple passwords and protections are required for access to certain types of information including detailed sales information, and department and company budgets, among other things.

76.     MicroVention uses security software to protect its technology resources and audits compliance with its security policies.  MicroVention also uses confidentiality legends to identify confidential and proprietary information.

77.     Printed documents used in the manufacturing process and on production lines are safeguarded under lock and key.  Physical access to proprietary equipment is restricted as is access to the computers that interface with that equipment.  Both are password-protected, and access and use are restricted to specified research and development or manufacturing engineers.

78.     All MicroVention employees receive training on the importance of maintaining the confidentiality of company information and documentation. Employees are required to sign a propriety information agreement which outlines the types of proprietary information the company maintains and the importance to MicroVention of maintaining the confidentiality of that information.  It also requires employees to return all company property, including all electronic information and written materials, prior to their departure from MicroVention.  All departing employees must complete an exit interview upon their departure.  Departing employees are reminded during that exit interview of their ongoing confidentiality obligations to MicroVention.  Departing employees are also asked to certify, in writing, that they have returned to the company all of its property, including all written and electronically stored information and that that they are not taking any MicroVention property with them.

79.     As for MicroVention's facilities, they are closed to the public.  Only authorized personnel are allowed on premises.  Buildings are access-controlled, and

badges are required.  Visitors must sign in at the reception desk and must prominently wear a "Visitor" badge.  Visitors are not permitted to roam MicroVention's physical facilities but must instead be escorted by an authorized MicroVention employee. Photographs, video recordings, and cell phone use are not permitted in either the clean rooms or in production facilities.  Vendors, suppliers, and physicians who are permitted to tour MicroVention facilities or who are working in collaboration with MicroVention must sign Non-Disclosure Agreements ("NDAs").

80.   Without question, MicroVention has implemented the processes and procedures reasonable and necessary to protect and maintain the confidentiality of its trade secrets and other proprietary information.

**E.   The Individual Defendants and The Theft of MicroVention Trade Secrets and Other Confidential and Proprietary Information**

81.   Each of the named individuals in this action (the "Individual Defendants") are former trusted MicroVention employees.  Each of these Individual Defendants had access to MicroVention trade secrets and other confidential and proprietary information necessary to perform their job responsibilities.

82.   Defendant David Ferrera ("Ferrera") was employed by MicroVention from July 1999 until August 2007, first as Senior Research and Development Manager and later as Director of Clinical Research.  Ferrera's responsibilities spanned the gamut from technical product development to supporting sales and marketing personnel.  During the development of MicroVention's V-Trak system, Ferrera was the company's primary liaison with customers and was intimately involved in the process of translating customer wants and needs into product design specifications and ultimately, into a marketable medical device product.  It was during Ferrera's employment, that MicroVention commenced the creation of its controlled documents library.  As set forth above, this interconnected library contained detailed documentation on the marketing specifications, product designs, and manufacturing processes undertaken in the development of MicroVention's early products.  These early products included the

-24-

MicroPlex Coil System, the early HydroLink hydraulic detachment controller, the V-Trak delivery system with its thermo-mechanical detachment mechanism, and MicroVention's first Hydrogel microcoils.  Ferrera was also present during the design, development, and market launch of MicroVention's first catheters and other access products.

83.    As both Senior Research and Development Manager and Director of Clinical Research, Ferrera had access to a broad range of highly proprietary, trade secret technical, operational, and business information.  This included the library of controlled documents, as well as sales figures, budgets, marketing analyses, and customer preference information, among other things.

84.    Ferrera's employment with MicroVention ended in or around August 2007.  On information and belief, following his departure from MicroVention, Ferrera was involved in at least one other medical device company before founding Blockade Medical, LLC ("Blockade") in November 2011.  Blockade is the predecessor to Defendant Balt.  Ferrera served as Balt's President, Chief Operating Officer, and Chief Technology Officer during his tenure with Balt.  Ferrera departed Balt in May 2020.

85.    Defendant Nguyen "Jake" Le ("Le") was employed by MicroVention from approximately May 2008 until November 2011, first as a Manufacturing Engineer II and later as a Senior Research and Development Engineer.  While employed at MicroVention, Le worked extensively on MicroVention's microcoil technology including on the research, development, and manufacturing of the V-Trak delivery system.  As an engineer, Le was intimately involved in the research and development of MicroVention medical devices, including the design, manufacturing, and testing of these devices, as well as the equipment and tools used in connection with the same.  As a result, Le had access to and use of MicroVention's extensive library of controlled documents and to its knowledge management system.

86.    Although Ferrera and Le did not work at MicroVention at the same time, on information and belief, Ferrera and Le knew one another and socialized with one

another, sometimes including other current and former MicroVention employees.  Le departed MicroVention to join Ferrera in starting Blockade.  On information and belief, Le has been continuously employed by Balt (formerly Blockade) from 2011 to the present, and currently serves as Balt's Director of Research and Development.

87.    Defendant Yoshitaka Katayama ("Katayama") was employed by MicroVention from August 2011 until March 2018, first as a Senior Process Development Engineer and later as the Engineering Manager responsible for the V-Trak Advanced delivery system before being demoted to a Staff Engineer position.  The nature of Katayama's job responsibilities required that he possess detailed knowledge of many MicroVention medical device products including SOFIA and other catheter and access products, microcoils and the V-Trak delivery system, FRED flow diverters, and LVIS coil-assist stents.  As a result, Katayama had access to and use of MicroVention's extensive library of controlled documents.

88.    Katayama terminated his employment with MicroVention in March 2018.  On information and belief, he did so to join Ferrera and Le at Balt, where he is currently employed as Balt's Process Engineering Manager.

89.    Defendant Stephanie Gong ("Gong") was employed by MicroVention as a Research and Development Engineering Intern during each of the four summers between 2014 and 2017.  Gong's responsibilities included, among other things, aiding in the completion of Build Records, assisting with the testing of product design units, drafting engineering protocols, conducting stent performance testing, and overall research and development support.  Gong worked on projects involving MicroVention's Scepter balloon catheters and the V-Trak delivery system.

90.    Following Gong's departure from MicroVention in September 2017, on information and belief, Gong was hired by Balt in March 2018 where she is currently employed as a Research and Development Engineer II.

91.    Defendant Michelle Tran ("Tran") was employed by MicroVention from June 2006 until April 2017, first as a Senior Manufacturing Engineer and later as a

Senior Project Manager, Research and Development.   While employed at MicroVention, Tran worked extensively on MicroVention's catheter and access products, including on the research, design, development, manufacture, and testing of the SOFIA line of catheters.  As a Senior Engineer and Senior Project Manager, Tran was also intimately involved in the research and development of the recipes and processes used for applying hydrophilic coatings to MicroVention catheters, as well as the equipment and tools used in connection with the same.  As a result of her position and responsibilities with MicroVention, Tran had access to and use of MicroVention's extensive library of controlled documents and to its knowledge management system.

92.    Tran terminated her employment with MicroVention in April 2017.  On information and belief, she did so to join Ferrera and Le at Balt, where she is currently employed as Balt's Director of Research and Development, Access Technologies.

93.    As a condition of their employment with MicroVention, each of the Individual Defendants, Ferrera, Le, Katayama, Gong and Tran, were required to sign an Employee Invention and Confidential Information Agreement (the "Confidentiality Agreement") whereby they agreed, among other things, to keep confidential and to not disclose or make use of, except for the benefit of MicroVention, either during or after their employment, any trade secrets, confidential information, knowledge, or other information known to MicroVention relating to its products, processes, know-how, designs, formulas, data, inventions, customers lists, business plans, marketing plans and strategies, pricing strategies or other matters pertaining to the business of MicroVention.   This included all information that these Individual Defendants produced, obtained, had access to, or otherwise acquired during their employment. Each of these Individual Defendants also agreed that they would not deliver, reproduce or in any way allow any of MicroVention's trade secrets or proprietary information to be delivered to, or used by, third parties without the specific direction or consent of a duly authorized representative of MicroVention.

94.     The Confidentiality Agreement that was signed by each of the Individual Defendants also required them to return to MicroVention all information and materials of the Company upon termination of their employment.  The Individual Defendants each agreed to promptly surrender and deliver to MicroVention, all records, materials, equipment, drawings, documents, and data of any nature pertaining to any invention, trade secret or confidential or proprietary information of the Company and to not take any of this confidential information, or a description of such information, with them upon their departure.

95.     At the time of their departure from MicroVention, the Individual Defendants were asked to sign a "Separation Checklist" whereby they certified to MicroVention that they had returned all proprietary information, files, memoranda, documents, records, copies of software and equipment belonging to the company.  They were also asked to certify that they had reviewed and understood that they were bound by their Confidentiality Agreement with MicroVention and that such confidentiality obligations survived the separation of their employment with the company.  Without question, the Individual Defendants were under a continuing obligation to maintain the confidentiality of MicroVention's trade secrets and confidential and proprietary information.

96.     In addition, the Individual Defendants also agreed to sign and deliver to MicroVention, upon termination of their employment, a "Termination Certificate" certifying that they did not have in their possession, nor had they failed to return, any records, documents, computer disks, tapes or printouts, sound recordings, customer lists, photographs, data specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies of them, or other documents or materials, equipment, samples, prototypes, models, or other property belonging to MicroVention.  The Individual Defendants further agreed to certify that they were in compliance with the Confidentiality Agreement, and that they would preserve as confidential all trade secrets, confidential or proprietary information, knowledge, data or other information

1  relating to products, inventions, processes, know-how, designs, formulas, test data, and

2  customers lists, among other things, pertaining to the business of MicroVention.

3      97.    On information and belief, despite the contractual promises made by

4  Ferrera, Le, Katayama, Gong, and Tran to MicroVention, each of the Individual

5  Defendants took with them, upon their departure from MicroVention, documentation

6  and information consisting of MicroVention's trade secrets, as well as confidential and

7  proprietary information, in violation of the Confidentiality Agreement.  Each of the

8  Individual Defendants failed to surrender and/or refused to return to MicroVention its

9  intellectual property as required pursuant to the terms of the Confidentiality Agreement.

10  Upon information and belief, certain of the Individual Defendants certified, at the time

11  of their departure from MicroVention, that they had returned to MicroVention all of its

12  property, including the trade secrets and proprietary and confidential information and

13  documentation in their possession, knowing that the certification provided was untrue.

14  Defendant Katayama refused to sign the Termination Certificate upon his departure

15  from MicroVention, also in violation of his obligations under the Confidentiality

16  Agreement.

17      98.    Unbeknownst to MicroVention, in violation of the Confidentiality

18  Agreement entered into by each of the Individual Defendants, on information and belief,

19  the Individual Defendants each took MicroVention's trade secrets and other

20  confidential and proprietary information with them upon their departure from

21  MicroVention, to use for the benefit of their new company (Blockade) and/or employer

22  (Blockade/Balt).  On information and belief, each Individual Defendant, on his or her

23  own behalf and/or in collusion with the other Individual Defendants, brought

24  MicroVention's trade secrets and confidential and proprietary information to Balt with

25  the express intention of using that information for the benefit of their new company

26  (Blockade) and/or employer (Blockade/Balt).  On information and belief, the Individual

27  Defendants did use MicroVention's trade secrets and confidential and proprietary

28  information for the benefit of Balt and its predecessor, Blockade.

99.     MicroVention first became aware of the Individual Defendants' unlawful conduct and breach of their confidentiality obligations to MicroVention just recently, when Balt produced over fifty-five thousand (55,000) proprietary and confidential documents belonging to MicroVention in discovery in a separate patent infringement lawsuit filed by MicroVention against Balt.  MicroVention was unaware of the theft of its trade secrets and other confidential and proprietary information by the Individual Defendants.

100.     On information and belief, Le, upon his departure from MicroVention and at the behest and encouragement of Ferrera, stole vast amounts of documents containing the trade secrets and confidential and proprietary information of MicroVention.  What was stolen from MicroVention was a complete "how to guide" for building a successful medical device company and its products.  On information and belief, Le took these highly proprietary documents from MicroVention so that he and Ferrera could use them to build Blockade, a competing medical device company.  On information and belief, Ferrera and Le knew that by using MicroVention trade secrets and proprietary and confidential information, they could short cut the time, labor and financial investment needed to get their small startup company up and running.  On information and belief, Ferrera and Le knew that the use of MicroVention trade secrets and proprietary and confidential information would save them tens of millions, if not hundreds of millions of dollars, in startup costs, including research and development costs, and would short cut considerably their time to market with competitive medical device products.

101.     On information and belief, Le, with the support, encouragement, and assistance of Ferrera, accessed and stole vast amounts of information from both the controlled documents library and the knowledge management system at MicroVention on his way out the door.   On information and belief, Blockade (now Balt) was built using this stolen information, including its entire company infrastructure, from product specification to design and development, to production and testing, to compliance and more.  As a result, on information and belief, Defendants developed and brought

copycat medical device products to market faster and with significantly less financial investment given their ability to capitalize on the stolen MicroVention proprietary and confidential information.  By capitalizing on this stolen information, Defendants obtained a substantial head start in building their business and designing and developing competing medical products, culminating in the sale of Blockade to Balt International, a French company, in just five (5) short years for more than $42M.  Blockade was re-branded as Balt USA following its sale.

102.  On information and belief, the theft of MicroVention trade secrets and proprietary and confidential information did not stop with Ferrera and Le's departures from MicroVention.  On information and belief, through their personal and professional relationships with existing MicroVention employees, Ferrera and Le continued to mine and misappropriate from MicroVention trade secrets and other confidential and proprietary information that both knew they were not entitled to possess, and that they then used for their own financial benefit and for the benefit of Balt.

103.  On information and belief, with the knowledge, support, and encouragement of Ferrera and Le, Individual Defendants Katayama and Gong left their employment with MicroVention to join Balt.  On information and belief, Katayama and Gong, like Ferrera and Le, stole trade secrets and confidential and proprietary information from MicroVention and brought it with them to Balt to use for the benefit of their new employer.

104.  On information and belief, with the knowledge, support, and encouragement of Ferrera and Le, Individual Defendant Tran left her employment with MicroVention to join Balt.  As she exited MicroVention for Balt, Tran stole hundreds of documents related to MicroVention's catheter products, including the SOFIA.  These documents are, among others, drawings, material specifications, quotes from MicroVention approved suppliers related to catheter parts, materials, and equipment, and cost information specific to manufacturing catheters.  On information and belief, Tran, like Ferrera and Le, stole MicroVention trade secrets and confidential and

-31-

proprietary information to use it for the benefit of her new employer, Balt, in jumpstarting Balt's development of a competing line of catheter and access products. Further, on information and belief, through her personal and professional relationships with existing MicroVention employees, suppliers, and contractors, Tran, like Ferrera and Le, continued to mine and misappropriate from MicroVention trade secrets and other confidential and proprietary information that she knew she was not entitled to possess following her departure from MicroVention, which she then used for her own financial benefit and for the benefit of Balt.

105.   As alleged above, MicroVention was unaware of the theft of its trade secrets and confidential and proprietary information.  The nefarious actions engaged in by the Individual Defendants were undertaken in secret.  MicroVention could not reasonably have discovered, and had no reason to suspect, that its former trusted employees would violate their contractual and legal obligations to MicroVention by engaging in the wholesale theft of every aspect of MicroVention's business.  Intellectual property theft of the magnitude engaged in by these Individual Defendants is, quite simply, unimaginable.

106.   As discussed in more detail below, MicroVention was also unaware of the use of this stolen information by Balt until recently when MicroVention began to uncover the same in discovery in another lawsuit between MicroVention and Balt.  On information and belief, Balt attempted to hide the existence of the stolen MicroVention documents in Balt's possession by, among other things, delaying the production of this information in discovery for almost a year.  Since uncovering the wholesale theft of MicroVention information by the Defendants as set forth herein, MicroVention has undertaken additional investigative efforts to uncover further acts of misappropriation of MicroVention trade secrets and confidential and proprietary information by the Defendants.   It is such efforts that recently uncovered the extensive theft of MicroVention trade secrets and confidential and proprietary information by Defendant Tran as set forth herein.  Without question, the nature and extent of the theft of

MicroVention trade secrets by Defendants will be the subject of continued ongoing discovery efforts in this case. MicroVention will seek further leave to amend this Amended Complaint should discovery reveal the theft of additional trade secrets and/or that additional former trusted employees of MicroVention were involved with Defendants in the theft of MicroVention intellectual property.

**F.      Blockade's Launch of its Unsuccessful Barricade Product**

107.    As set forth above, on information and belief, Balt's predecessor, Blockade, was built using stolen MicroVention trade secrets and confidential and proprietary information. Within 18 short months of launching their new company, Ferrera, Le, and Blockade obtained FDA approval for, and commenced selling their first and only commercial medical product, Barricade.

108.    Barricade is a platinum coil system for treating brain aneurysms. It is based on outdated electrolytic detachment technology, which is slower, less user friendly, and carries a greater risk to patient safety. For at least those reasons, the Barricade system was not a commercial success.

109.    On information and belief, the commercial failure of the Barricade system required Defendants to pivot. Eager for a quick payout on their new startup venture, on information and belief, Ferrera, Le and others began development of a copycat thermal detachment implant coil and delivery system to mimic MicroVention's commercially successful V-Trak system. On information and belief, this new product, which became known as the Optima Coil System ("Optima"), was designed, and developed by using MicroVention's trade secrets and confidential and proprietary information.

110.    Transitioning from a coil implant system that uses electrolytic detachment to one that uses thermal detachment requires changes to every part of the implant coil and delivery system. This includes, among other things, changing the tether that connects the implant and pusher, redesigning the pusher to include a resistive heater coil at its tip, and developing a completely different detachment controller. Implementing these changes requires considerable skill and effort, including many

-33-

hundreds of hours spent gathering physician feedback on the product's design, identifying design parameters, selecting, and testing materials and equipment, refining the design, materials, and production processes, testing the materials and components, and gaining FDA approval to market the new product.  On information and belief, Defendants by-passed this extensive and expensive process and instead, tapped into the treasure trove of trade secrets and confidential and proprietary documents stolen from MicroVention.  These documents taken from MicroVention's controlled documents library and knowledge management system gave Defendants step by step instructions on how to design, develop, test and market a copycat V-Trak system.

111.   Further, on information and belief, the expansive theft of MicroVention's intellectual property by Defendants is underscored by their brazen and unimaginative verbatim copying of large sections of MicroVention's "Instructions for Use" guide that is shipped with its V-Trak system.

112.   The critical importance of MicroVention's thermal detachment technology to the acquisition of Blockade by Balt cannot be overstated.  On information and belief, Ferrera himself conceded the importance of this technology, stating in a March 2, 2018, email to Tom Fogarty, then CEO of Neurvana Medical, LLC, a company for which Ferrera had served as chairman of the board of managers, that "Balt paid $42.5M to acquire Blockade.  That value was essentially for the Optima Coil system."

**G.   Uncovering Defendants' Theft of More Than 55,000 Confidential and Proprietary MicroVention Documents**

113.   MicroVention first became aware of the Balt Optima Coil System when it learned of the product's FDA 510(k) approval in a Balt press release dated March 20, 2018.

114.   A few months later, on June 11–13, 2018, MicroVention employee Heath Bowman ("Bowman"), then MicroVention's Director of Research & Development, attended the Live Interventional Neuroradiology, Neurology & Neurosurgery Course (LINNC) in Paris, France.  During this course, Bowman attended a session entitled

"Balt Industry-sponsored Symposium" that included a presentation on Balt's new Optima medical device product.  Immediately recognizing the uncanny similarity between the Optima and the V-Trak, Bowman took photographs of the presentation slides touting the "key features" of Balt's new product.  Thereafter, MicroVention undertook an investigation into the new Balt Optima product, including conducting testing on the product itself.  It was determined, following this investigation, that the Optima is a direct copy of MicroVention's V-Trak.

115.   On July 8, 2019, MicroVention filed suit against Balt in this District for patent infringement[1], asserting that Balt's Optima Coil System infringes multiple patents held by MicroVention covering technology used in Balt's new Optima medical product.  At the time the patent lawsuit was filed, MicroVention was unaware of Defendants' wholesale theft and use of MicroVention trade secrets, as well as other confidential and proprietary information.  However, given the outcome of MicroVention's testing of the Optima and the likely involvement of key, former MicroVention employees and Individual Defendants Ferrera and Le in the development of that product, MicroVention explored early on in discovery in the patent case, the possibility that these former trusted employees, as well as others, may have taken trade secrets and other proprietary and confidential information from MicroVention upon their departure.

116.   On September 25, 2019, MicroVention served four document production requests on Balt aimed at discovering whether Balt had any MicroVention documents in its possession.  Specifically, the requests asked for all non-publicly available MicroVention documents in Balt's possession whether obtained through any former MicroVention employee or consultant, all documents bearing certain MicroVention confidentiality legends, and all CAD drawings for MicroVention products.

---

[1] All documents referenced in this Amended Complaint and identified by the Bates range using the prefix "BALT" were produced by Defendant Balt in the patent case.

117.   Balt spent nearly ten months dragging its feet and attempting to dodge its production obligations.  Finally, in response to MicroVention's threat of a motion to compel absent immediate compliance, on August 14, 2020, Balt handed over 55,000 individual files containing documents stolen from MicroVention.  This production of stolen information ("BALT008") spanned more than 186,000 pages, representing every conceivable document type set forth in MicroVention's controlled documents library and knowledge management system.  This included, but was not limited to, Marketing Specifications, Design Specifications, Part Drawings for products, tools, and equipment, Manufacturing Procedures, Test Methods, Test Reports, Test Data, Build Records, Supplier Lists, Customer Needs Memorandums, Regulatory Filing Checklists, Quality Assurance Procedures and Specifications, and even MicroVention's Employee Handbook and drawings depicting the layout of MicroVention's facilities.  Indeed, the scope of Balt's theft is overwhelming.

118.   The trade secrets and confidential and proprietary information stolen from MicroVention included not just design and development documents for the V-Trak system (Defendants had possession of multiple revisions of the V-Trak documents), but also for other MicroVention products including microcoil implants, Scepter balloon catheters, Headway catheters, FRED flow diverters, and LVIS coil-assist stents, among others.

### 1.   Defendants' Theft Includes Highly Confidential and Proprietary Technical Documents Concerning MicroVention's Products

119.   Based on Balt's August 14, 2020 document production in the related patent case, on information and belief, Individual Defendants Le and Ferrera, along with others, stole at least fourteen (14) unique MicroVention Marketing Specifications (including in many cases multiple revisions) identified to date, from MicroVention with the intent to use these documents, and on information and belief Defendants are using these documents, to benefit their new venture—Blockade (now Balt).  MicroVention incorporates by reference paragraphs 36 and 72 through 80 which describe, in detail,

-36-

the highly confidential and proprietary nature of these Marketing Specifications, the value of these specifications to MicroVention and to a competitor who obtains them, as well as the considerable efforts undertaken by MicroVention to maintain the confidentiality of these Marketing Specifications.   MicroVention also attaches as Exhibit A, a table setting forth the MicroVention internal document number, the most recent revision, the Marketing Specification title, the relevant product line, and the Bates range for each of the fourteen (14) unique Marketing Specifications identified to date, that were misappropriated by Individual Defendants Le and Ferrera, among others. The content of each of these Marketing Specification controlled documents is a MicroVention trade secret.

120.   Based on Balt's August 14, 2020 document production in the related patent case, on information and belief, Individual Defendants Le and Ferrera, along with others, stole at least forty-one (41) unique MicroVention Design Specifications (including in many cases as many as a dozen different revisions for some Specifications) identified to date, from MicroVention with the intent to use these documents, and on information and belief Defendants are using these documents, to benefit their new venture—Blockade (now Balt).  MicroVention incorporates by reference paragraphs 37 through 42, 58 and 72 through 80, which describe, in detail, the highly confidential and proprietary nature of these Design Specifications, the value of these specifications to MicroVention and to a competitor who obtains them, as well as the considerable efforts undertaken by MicroVention to maintain the confidentiality of these Design Specifications.   MicroVention also attaches as Exhibit B, a table setting forth the MicroVention internal document number, the most recent revision, the Design Specification title, the relevant product line, and the Bates range for each of the forty-one (41) unique Design Specifications identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.   The content of each of these Design Specification controlled documents is a MicroVention trade secret.

121. Based on Balt's August 14, 2020 document production in the related patent case, on information and belief, Individual Defendants Le and Ferrera, along with others, stole at least five hundred seventy-eight (578) unique MicroVention Part Drawings (including in many cases dozens of revisions) identified to date, from MicroVention with the intent to use these documents, and on information and belief Defendants are using these documents, to benefit their new venture—Blockade (now Balt). MicroVention incorporates by reference paragraphs 42 through 45, 61 through 64, and 72 through 80, which describe, in detail, the highly confidential and proprietary nature of these Part Drawings, the value of these drawings to MicroVention and to a competitor who obtains them, as well as the considerable efforts undertaken by MicroVention to maintain the confidentiality of these Part Drawings. MicroVention also attaches as Exhibit C, a table setting forth the MicroVention internal document number, the most recent revision, the Part Drawing title, and the Bates range for each of the five hundred seventy-eight (578) unique Part Drawings identified to date, misappropriated by Individual Defendants Le and Ferrera, among others. In addition to these Part Drawings, the stolen documents identified to date also include at least seven thousand, eight hundred eighteen (7,818) SolidWorks files, or CAD drawings, of MicroVention parts, products, components, tools, and equipment. The content of each of these Part Drawing controlled documents and SolidWorks files is a MicroVention trade secret.

122. Based on Balt's August 14, 2020 document production in the related patent case, on information and belief, Individual Defendants Le and Ferrera, along with others, stole at least three hundred seventy-six (376) unique MicroVention Manufacturing Procedures (including in many cases as many as 25 different revisions for some Procedures) identified to date, from MicroVention with the intent to use these documents, and on information and belief Defendants are using these documents, to benefit their new venture—Blockade (now Balt). MicroVention incorporates by reference paragraphs 46 through 49 and 72 through 80, which describe, in detail, the

1    highly confidential and proprietary nature of these Manufacturing Procedures, the value

2    of these procedures to MicroVention and to a competitor who obtains them, as well as

3    the considerable efforts undertaken by MicroVention to maintain the confidentiality of

4    these Manufacturing Procedures.  MicroVention also attaches as Exhibit D, a table

5    setting forth the MicroVention internal document number, the most recent revision, the

6    Manufacturing Procedure title, the relevant product line, a brief description of the nature

7    of the Manufacturing Procedure, and the Bates range for each of the three hundred

8    seventy-six (376) unique Manufacturing Procedures identified to date, misappropriated

9    by Individual Defendants Le and Ferrera, among others.  The content of each of these

10   Manufacturing Procedures controlled documents is a MicroVention trade secret.

11          123.   Based on Balt's August 14, 2020 document production in the related patent

12   case, on information and belief, Individual Defendants Le and Ferrera, along with

13   others, stole at least two hundred twelve (212) unique MicroVention Test Methods

14   (including in many cases multiple revisions) identified to date, from MicroVention with

15   the intent to use these documents, and on information and belief Defendants are using

16   these documents, to benefit their new venture—Blockade (now Balt).  MicroVention

17   incorporates by reference paragraphs 50 through 54, and 72 through 80, which describe,

18   in detail, the highly confidential and proprietary nature of these Test Methods, the value

19   of these methods to MicroVention and to a competitor who obtains them, as well as the

20   considerable efforts undertaken by MicroVention to maintain the confidentiality of

21   these Test Methods.  MicroVention also attaches as Exhibit E, a table setting forth the

22   MicroVention internal document number, the most recent revision, the Test Method

23   title, the relevant product line, a brief description of the nature of the Test Method, and

24   the Bates range for each of the two hundred twelve (212) unique Test Methods

25   identified to date, misappropriated by Individual Defendants Le and Ferrera, among

26   others.  In addition to the Test Methods controlled documents, the stolen documents

27   identified to date also include at least two thousand, nine hundred nine (2,909) files

28   containing Test Data measured or taken in connection with the stolen Test Methods and

-39-

at least four hundred thirty-five (435) unique Test Reports summarizing and analyzing the Test Data.  MicroVention also attaches as Exhibit F, a table setting forth the MicroVention internal document number, the most recent revision, the Test Report title, and the Bates range for each of the four hundred thirty-five (435) unique Test Reports (including in many cases multiple revisions) identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.  The content of these Test Methods, Test Data and Test Reports are MicroVention trade secrets.

124.    Based on Balt's August 14, 2020 document production in the related patent case, on information and belief, Individual Defendants Le and Ferrera, along with others, stole at least thirty-seven (37) unique MicroVention Risk Assessment Plans (including in some cases as many as a dozen revisions) identified to date, from MicroVention with the intent to use these documents, and on information and belief Defendants are using these documents, to benefit their new venture—Blockade (now Balt).  MicroVention incorporates by reference paragraphs 55 through 59 and 72 through 80, which describe, in detail, the highly confidential and proprietary nature of these Risk Assessment Plans, the value of these plans to MicroVention and to a competitor who obtains them, as well as the considerable efforts undertaken by MicroVention to maintain the confidentiality of these Risk Assessment Plans. MicroVention also attaches as Exhibit G, a table setting forth the MicroVention internal document number, the most recent revision, the Risk Assessment Plan title, the relevant product line, and the Bates range for each of the thirty-seven (37) unique Risk Assessment Plans identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.  The content of each of these Risk Assessment Plan controlled documents is a MicroVention trade secret.

125.    Based on Balt's August 14, 2020 document production in the related patent case, on information and belief, Individual Defendants Le and Ferrera, along with others, stole at least two hundred forty-one (241) unique MicroVention Build Records (including in many cases dozens of revisions) identified to date, from MicroVention

-40-

with the intent to use these documents, and on information and belief Defendants are using these documents, to benefit their new venture—Blockade (now Balt). MicroVention incorporates by reference paragraphs 60 through 64 and 72 through 80, which describe, in detail, the highly confidential and proprietary nature of these Build Records, the value of these records to MicroVention and to a competitor who obtains them, as well as the considerable efforts undertaken by MicroVention to maintain the confidentiality of these Build Records.  MicroVention also attaches as Exhibit H, a table setting forth the MicroVention internal document number, the most recent revision, the Build Record title, the relevant product line, and the Bates range for each of the two hundred forty-one (241) unique Build Records identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.  The content of each of these Build Records controlled documents is a MicroVention trade secret.

126.   Based on Balt's August 14, 2020 document production in the related patent case, on information and belief, Individual Defendants Le and Ferrera, along with others, stole at least three hundred twenty-six (326) unique MicroVention Equipment Specifications (including in many cases multiple revisions) and at least two hundred seven (207) unique Equipment Drawings and Tool Drawings (including in many cases multiple revisions) identified to date, from MicroVention with the intent to use these documents, and on information and belief Defendants are using these documents, to benefit their new venture—Blockade (now Balt).  MicroVention incorporates by reference paragraphs 65 through 70 and 72 through 80, which describe, in detail, the highly confidential and proprietary nature of these Equipment Specifications, Equipment Drawings and Tool Drawings, the value of these specifications and drawings to MicroVention and to a competitor who obtains them, as well as the considerable efforts undertaken by MicroVention to maintain the confidentiality of these Equipment Specifications, Equipment Drawings and Tool Drawings.  MicroVention also attaches as Exhibit I, a table setting forth the MicroVention internal document number, the most recent revision, the Equipment Specification title, the relevant product line, and the

-41-

1   Bates range for each of the three hundred twenty-six (326) unique Equipment
2   Specifications identified to date, misappropriated by Individual Defendants Le and
3   Ferrera, among others.  MicroVention also attaches as Exhibit J, a table setting forth the
4   MicroVention internal document number, the most recent revision, the Equipment
5   Drawing or Tool Drawing title, and the Bates range for each of the two hundred seven
6   (207) unique Equipment Drawings or Tool Drawings identified to date, misappropriated
7   by Individual Defendants Le and Ferrera, among others.  In addition, there are at least
8   five hundred two (502) unique Preventative Maintenance documents (including in many
9   cases multiple revisions) that were taken and used by Balt that describe the steps and
10   schedule for maintaining MicroVention's proprietary tools and equipment.  The content
11   of these Equipment Specifications, Equipment Drawings, Tool Drawings and
12   Preventive Maintenance documents are MicroVention trade secrets.

13        127.   Further, among the stolen MicroVention documents are at least sixty-eight
14   (68) unique Quality Assurance Procedures (including in many cases a dozen or more
15   revisions), which specify the organizational structure, guidelines, and policies for a
16   wide range of business aims, including providing quality inspection of received
17   components and work-in-progress, handling product complaints and taking corrective
18   action, and providing training of both line workers and quality inspectors.  Collectively,
19   the Quality Assurance Procedures contain much of the information about how
20   MicroVention runs its day-to-day operations.  Creating these documents from scratch
21   involves substantial time and effort, and oftentimes includes hiring expensive outside
22   consultants.  Like so many of the other controlled documents addressed herein,
23   MicroVention revises its Quality Assurance Procedures to incorporate lessons learned
24   over time and updates its Quality Assurance Plans accordingly.  On information and
25   belief, by misappropriating and using MicroVention's Quality Assurance Procedures,
26   Individual Defendants Le and Ferrera, among others, were able to save Balt
27   considerable time and money in developing its own quality procedures, including
28   avoiding the out-of-pocket costs associated with hiring expensive outside consultants.

-42-

MicroVention also attaches as Exhibit K, a table setting forth the MicroVention internal document number, the most recent revision, the Quality Assurance Procedure title, and the Bates range for each of the sixty-eight (68) unique Quality Assurance Procedures identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.   The content of each of these Quality Assurance Procedures controlled documents is a MicroVention trade secret.

128.   Similarly, on information and belief, at least forty-six (46) unique Quality Specifications (including in many cases a dozen or more revisions) are among the documents stolen by Individual Defendants Le and Ferrera, among others.   Quality Specifications define the standards used in production to identify if a part is acceptable and often include pictures to assist quality inspectors to assess the finished products on the line.   Learning what does and does not work requires trial and error, including the evaluation of product failures to identify problems that may not have been anticipated. When that happens, the Quality Specifications are updated with new photographs and instructions to alert inspectors to issues and to teach them to spot problems.   On information and belief, by misappropriating and using MicroVention's Quality Specifications, Defendants were able to save considerable time and money in bringing products to market.   MicroVention also attaches as Exhibit L, a table setting forth the MicroVention internal document number, the most recent revision, the Quality Specifications title, the relevant product line, and the Bates range for each of the forty-six (46) unique Quality Specifications identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.   The content of each of these Quality Specifications controlled documents is a MicroVention trade secret.

129.   Also, among the stolen MicroVention documents are at least seventy-nine (79) documents related to the design and manufacture of MicroVention's V-Grip controller, used by physicians to trigger detachment of microcoil implants delivered by MicroVention's V-Trak delivery system.   These documents include engineering drawings for V-Grip's housing, schematics and Gerber files for V-Grip's printed circuit

-43-

1   board, the bill of materials (BOM) showing the type and quantity of electrical
2   components like LEDs, resistors, and capacitors needed to make the circuit board, and
3   even the source code that controls V-Grip's function.  MicroVention also attaches as
4   Exhibit M, a table setting forth the document title, a brief description of the nature of
5   each document, and the Bates range for each of the seventy-nine (79) documents related
6   to MicroVention's V-Grip controller identified to date, misappropriated by Individual
7   Defendants Le and Ferrera, among others.  On information and belief, Individual
8   Defendants Le and Ferrera, among others, used these valuable, confidential, and
9   proprietary documents to design Balt's copycat XCEL Detachment Controller for use
10  with Balt's copycat Optima product.  The content of each of these documents is a
11  MicroVention trade secret.

12      130.  In addition, Balt produced back to MicroVention an entire cloned
13  computer hard drive (BALT0127205) containing trade secrets and other proprietary and
14  confidential information pertaining to MicroVention's hydrophilic coatings for its
15  entire line of catheter and access products, including Headway, SOFIA, and Scepter.
16  These stolen process recipes took MicroVention almost a year of experimentation to
17  perfect.  By loading these files—conveniently grouped on the hard drive in a single
18  folder entitled "Recipes"—onto a computer controlling a plasma machine, Defendants
19  had everything they needed to replicate these proprietary recipes.  On information and
20  belief, Defendants have used, without MicroVention's knowledge or consent, these
21  highly proprietary and valuable process recipes in the design and development of
22  competing medical products.

23      131.  Given the computers that control the plasma treatment machines and store
24  the proprietary coating recipes at MicroVention are password-protected, only a
25  MicroVention Research and Development or Manufacturing engineer would likely
26  have been able to access and make a mirror image of the computer files reflected in
27  Balt's document production.  Balt represented, in producing the information, that these

28

-44-

1   computer files were associated with Defendant Le.  At the time of his departure from

2   MicroVention, Le was a Senior Research and Development Engineer for MicroVention.

3              **2.    Defendants' Theft Of Highly Confidential and Proprietary
                       Documents From MicroVention's Knowledge Management
4                      System**

5        132.   Defendants' theft of MicroVention's trade secrets was not limited to the

6   theft of technical documents useful in the design and development of competing

7   medical device products and their components.  On information and belief, Individual

8   Defendants Ferrera and Le, among others, also stole from MicroVention documents

9   from its knowledge management system as described herein.  This included documents

10  that memorialized the Company's insights, procedures, and checklists used to

11  streamline the time and resource-intensive process for obtaining regulatory approval for

12  its medical device products.    Defendants also misappropriated "business and

13  competitive intelligence" documents that reflect information gathered on customer

14  needs and preferences, approved suppliers and vendors, as well as information on the

15  compensation paid by MicroVention to its consulting physicians.

16       133.   Among the stolen MicroVention documents are at least nineteen (19)

17  Regulatory Strategy and Submission Checklists (including in many cases multiple

18  revisions), each of which sets forth a roadmap for regulatory approval of a specific

19  medical device product based on MicroVention's research, analysis, and experience.

20  These confidential and proprietary documents contain comparisons between new

21  products and "predicate devices," which can be either MicroVention devices or

22  competitor devices, but that have already gained regulatory approval.  The Regulatory

23  Strategy documents are valuable because they identify product similarity to predicate

24  devices which can translate to fewer regulatory hurdles to overcome and quicker

25  approval time.  The Submission Checklists identify what the actual planned strategy is

26  for gaining product approval and the assumptions that underlie that strategy.   The

27  Submission Checklists set forth a rough timeline for when, and in what order, regulatory

28  approval will be sought and in which countries and regions around the world.  The

-45-

highly sensitive information contained in these documents is based on MicroVention's past collective experience with the regulatory process.  On information and belief, by misappropriating and using MicroVention's Regulatory Strategy and Submission Checklists, Defendants saved considerable time and expense bringing products to market.  MicroVention also attaches as Exhibit N, a table setting forth the MicroVention internal document number, the most recent revision, the Regulatory Strategy and Submission Checklist title, the relevant product line, and the Bates range for each of the nineteen (19) Regulatory Strategy and Submission Checklists identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.  Each of these Regulatory Strategy and Submission Checklists controlled documents is a MicroVention trade secret.

134.   Similarly, among the stolen MicroVention documents are at least eight (8) revisions of MicroVention's Approved Product Matrix.  The Approved Product Matrix is how MicroVention tracks the regulatory approval status of its medical device products in countries and regions around the world.  *See* BALT0017580, BALT0019714, BALT0024763–64, BALT0051072–90.  The information set forth in the Approved Product Matrix includes where MicroVention's product lines of microcoil implants, detachment systems, and guidewires are approved for sale, as well as the status and planned approval dates for products in markets that MicroVention has not yet entered but plans to in the future.  Unlike the United States where the FDA maintains a searchable public database of approved medical devices, most countries around the world do not make such information publicly available.

135.   For a competitor like Balt, compiling the information contained in the Approved Product Matrix would be both a time-intensive and expensive process involving market surveillance in dozens of countries and regions around the world, and across many different product categories.  By misappropriating MicroVention's Approved Product Matrix documentation, on information and belief, Individual Defendants Ferrera and Le, among others, obtained highly valuable, strategic

-46-

1   intelligence—a ready-made roadmap of when and how MicroVention entered markets,

2   with what products, and where it plans to go next.  Moreover, by having multiple

3   revisions of the Matrix spanning many years, Defendants were able to benefit from

4   knowing the process MicroVention went through to expand its product offerings, and

5   the how and when behind product decisions that were made.  For a start-up company

6   like Balt who, on information and belief, built its copycat medical device products based

7   on stolen MicroVention technology, the trade secret information contained in the

8   Approved Product Matrix is particularly valuable.

9          136.   Among the stolen MicroVention documents are also at least four (4)

10   Customer Needs Memos, which document what customers are looking for in medical

11   device products.  These Customer Needs Memos contain competitive intelligence

12   gathered by MicroVention based on feedback from physicians, patients, sales

13   representatives, and distributors, among others.  They also contain unmet customer

14   needs analyses, trends in the marketplace, and competitive product analyses.  *See, e.g.*,

15   BALT0114085–136, BALT0114166–83.   On information and belief, Individual

16   Defendants Ferrera and Le, among others, specifically targeted and misappropriated

17   Customer Needs Memos relating to the Azur line of coils for treating peripheral

18   aneurysms sold under the Terumo brand.   These Memos include as attachments

19   confidential email communications between MicroVention employees and Terumo

20   (MicroVention's parent) employees discussing product changes and improvements to

21   be made, as well as planned product line extensions and detailed project planning

22   timelines.  Without question such competitive information is of considerable value to

23   Balt, which not only improperly and unlawfully obtained a roadmap to its competitor's

24   current and future product plans, but also insight into customer wants and needs that it

25   could, and on information and belief did, capitalize on without undertaking any of the

26   time, effort, or expense to compile, analyze and address those needs.

27          137.   At least ten (10) revisions of MicroVention's Approved Supplier List are

28   also among the documents stolen from MicroVention.   *See, e.g.*, BALT0033963–

BALT0033968; BALT0034011–BALT0034016; BALT0034198–BALT0034204; BALT0050983–BALT0051044.  The Approved Supplier List contains information on over one hundred (100) MicroVention suppliers, including whether the suppliers have received third-party certification, their reputation for quality, whether first articles (items from the first production run) have been approved or not, whether the supplier has been audited, the date the supplier was approved by MicroVention, and a letter grade ranking the suppliers.

138.  MicroVention's Approved Supplier List contains a summary of highly confidential information compiled by MicroVention over years of experience with these suppliers.  It serves as a cheat sheet to identify which suppliers should be prioritized based on the various products and components they provide.  In addition to stealing MicroVention's Approved Supplier List, on information and belief, Individual Defendants Ferrera and Le, among others, stole at least four hundred fifty-two (452) Receiving Specifications (including in many cases multiple revisions) from MicroVention, which identify both the suppliers and vendors with which MicroVention works as well as the materials and components they supply.  MicroVention also attaches as Exhibit O, a table setting forth the MicroVention internal document number, the most recent revision, the Receiving Specification title, and the Bates range for each of the four hundred fifty-two (452) Receiving Specifications identified to date, misappropriated by Individual Defendants Le and Ferrera, among others.  Without question, having access to MicroVention's Approved Supplier List and its Receiving Specifications permitted Balt to forego the labor-intensive and expensive trial-and-error process of evaluating multiple suppliers for product materials and components.  On information and belief, by using these trade secret documents, Balt bypassed that time and resource-intensive process and instead targeted the same approved suppliers that MicroVention had already vetted, approved, and ranked in order of preference.  Each of these Approved Supplier Lists and Receiving Specification controlled documents is a MicroVention trade secret.

139.   On information and belief, Individual Defendants Ferrera and Le, among others, also misappropriated from MicroVention at least thirty-nine (39) Consulting Agreements between MicroVention and various physicians.   These Consulting Agreements pertain to services the physicians agreed to undertake for MicroVention, including conducting and analyzing clinical research using MicroVention products, presenting research results at conferences, and assisting MicroVention in the development of embolic devices and neurovascular implants.   These Consulting Agreements contain the identities of the physicians with whom MicroVention has developed relationships and provide details about the compensation paid for their services.

140.   In addition to the physician Consulting Agreements, on information and belief, Individual Defendants Ferrera and Le, among others, misappropriated Consulting Agreements and confidential correspondence between MicroVention and its engineering consultants.   These documents detail product and materials research performed by these consultants for MicroVention.   Attached hereto as Exhibit P is a table setting forth the Bates range for the Consulting Agreements and correspondence identified to date, misappropriated by Individual Defendants Le and Ferrera, among others, and, on information and belief, currently being used by Balt.   Each of these controlled documents, like the others set forth herein, contains MicroVention trade secrets.

141.   Ironically, among the stolen MicroVention documents that Balt identified in the patent case as being in Defendant Ferrera's possession, is the September 2001 version of MicroVention's Employee Handbook.   *See* BALT0041309–29.   Page 15 of that Handbook states, "Return of Property: You are responsible for all MicroVention property, materials, or written information issued to you or in your possession or control.   All MicroVention property must be returned on or before your last day of work."   BALT0041329.

### 3. Individual Defendants Katayama and Gong's Participation in the Misappropriation of MicroVention's Trade Secrets

142. While Balt represented that the custodians of the information stolen from MicroVention were limited to Defendants Ferrera and Le, a review of the metadata for the produced documents suggests others were also involved. Ninety-one (91) of the stolen documents produced by Balt were created between November 2, 2011, and February 28, 2012, *after* both Ferrera and Le departed MicroVention. These highly proprietary documents include Manufacturing Procedures, Part Drawings, and Quality Assurance Procedures, many of which relate to MicroVention's catheters and access products, V-Trak delivery system, FRED flow diverters, and LVIS coil-assist stents. *See*, *e.g.*, BALT0172570–72, BALT0177871–76, BALT0177971–83, BALT0178089–94. Two hundred thirty-seven (237) of the stolen documents produced by Balt are SolidWorks drawings for various MicroVention products like FRED and V-Trak that were modified by MicroVention employees *after* both Ferrera and Le departed MicroVention, likewise suggesting that others assisted Ferrera and Le in the theft of MicroVention trade secrets and other confidential and proprietary information.

143. On information and belief, given the creation and modification dates of the aforementioned documents, the actual theft of certain highly proprietary, confidential and trade secret information appears to have been undertaken by others including, but not necessarily limited to, Individual Defendants Katayama and Gong.

#### a. Katayama's theft of MicroVention trade secrets while employed by MicroVention and transfer of those trade secrets to Le and Balt

144. The ninety-one (91) highly proprietary technical documents identified in paragraph 142 above relate to a wide variety of MicroVention product lines including catheters and access products, V-Trak, FRED, and LVIS, each of which Katayama worked on during his employment with MicroVention. Not every MicroVention employee had access to these highly proprietary documents covering a broad range of products. However, Katayama did have access to such documents by virtue of the

-50-

1   senior engineering positions he held with MicroVention. These documents were,
2   without question, created during the time Katayama was employed by MicroVention.
3   Further, seventeen (17) additional MicroVention documents in Balt's possession—all
4   SolidWorks drawings for tools used by MicroVention to manufacture its FRED flow
5   diverters—were last modified by Katayama *after* both Ferrera and Le departed
6   MicroVention.

7       145.   On information and belief, Individual Defendant Katayama took the
8   confidential and trade secret documentation specified above at the request of, and with
9   the support and encouragement of, Individual Defendant Le. Based on his prior
10  employment at MicroVention, Le knew that Katayama, having been employed for
11  nearly seven (7) years in various engineering roles at MicroVention, would have access
12  to highly proprietary technical information that could be beneficial to Balt's product
13  development and overall business. On information and belief, Le instigated, solicited,
14  and directed then existing MicroVention employees, including Katayama, to steal trade
15  secrets and other highly proprietary and confidential documents from their former
16  employer and to bring such information with them upon joining Balt. On information
17  and belief, Le intentionally used his personal and professional connections with current
18  and former MicroVention employees to induce them to violate their contractual
19  obligations to MicroVention by providing him with access to MicroVention
20  confidential, proprietary and trade secret information.

21      146.   Katayama resigned from MicroVention on February 28, 2018, two weeks
22  after he was demoted from his position as Manager, Manufacturing Engineering, to
23  Staff Engineer. On information and belief, Katayama was angry at MicroVention for
24  demoting him. Within mere weeks of resigning from MicroVention, Katayama began
25  working with Defendant Le at Balt as its new Process Engineering Manager.

26      147.   As set forth above, employees who depart MicroVention are asked to
27  acknowledge items set forth in a document entitled "The Separation Checklist." Like
28  other departing employees, Defendant Katayama initialed and dated all items on the list

-51-

acknowledging receipt of various human resources documents and the return of specific company property including his access card, parking permit, keys, mobile phone, laptop, tools, and lab notebook.  However, unlike other departing employees, Katayama steadfastly refused to sign and acknowledge MicroVention's Termination Certificate. The Termination Certificate states:

> This is to certify that I do not have in my possession, nor have I failed to return any records, documents, computer disks, tapes or printouts, sound recordings, customer lists, photographs, data, specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies of them, or other documents or materials, equipment, samples, prototypes, models or other property belonging to MicroVention, Inc., it's [sic] successors and assigns (hereafter referred to as "the Company").
>
> . . .
>
> I further agree that in compliance with the Employee Proprietary and Confidential Information and Inventions Agreement, I will preserve as confidential all trade secrets, confidential or proprietary information (as defined therein), knowledge, data, or other information relating to products, inventions, processes, know-how, designs, formulas, test data, customer lists, or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates.

148.   Katayama also refused to sign and date the Separation Checklist itself, which states:

> I have returned any proprietary information, files, memoranda, documents, records, copies of software and equipment to MicroVention, Inc., upon my separation.  Further, I have reviewed and understand the *Employee Information and Confidential Information Agreement* signed upon my acceptance of employment and understand that I am bound by the terms of that Agreement, surviving my separation.

149.   There is no legitimate reason for Defendant Katayama to refuse to sign either the Termination Certificate or the Separation Checklist upon his departure from MicroVention.  On information and belief, Katayama refused to sign both documents because he intended to take from MicroVention, and did take from MicroVention, proprietary, trade secret and confidential technical documents pertaining to MicroVention's catheters and access products, the V-Trak delivery system, FRED flow diverters, and LVIS coil-assist stents, all of which Katayama worked on while at

MicroVention.  On information and belief, Katayama took MicroVention documents to help Balt build a competing product line of medical device products.

### b. Le and Ferrera's deliberate solicitation of trade secrets and confidential information from MicroVention employees

150.   Another of the stolen documents produced back to MicroVention by Balt in discovery in the patent case, is a slide deck from an Investors Meeting of MicroVention's parent company, Terumo.  *See* BALT0038738-44.  The custodian Balt identifies as associated with this document is Individual Defendant Ferrera.  Although the presentation given on March 14, 2014, may have been publicly accessible, the corresponding slide deck in Defendant Ferrera's possession was not.  On information and belief, Ferrera, like Le, used his connections and influence with his former colleagues at MicroVention to solicit and obtain, in knowing violation of their confidentiality obligations, confidential information such as this slide deck which contained information about Terumo's near-term growth goals, forecasts for the neurovascular market, a comparison of the neurovascular and coronary market, and an assessment of MicroVention's strengths.

### c. Gong's delivery and use of MicroVention trade secrets for the benefit of Balt

151.   On information and belief, Individual Defendant Katayama is not the only former employee of MicroVention that Individual Defendants Ferrera and Le used to mine MicroVention trade secrets and confidential and proprietary information for the benefit of Balt.  On April 1, 2020, in the related patent case, Balt produced a large number of technical drawings, including multiple revisions to those drawings and associated documents relating to Balt's Optima product.  Included in the document production for the Optima product were three identical copies of an Excel spreadsheet authored by MicroVention employee Heath Bowman ("MVI Spreadsheet").  *See* BALT0013339, BALT0013626, and BALT0014266.  The MVI Spreadsheet contains confidential and proprietary information used by MicroVention to compute the k-value

-53-

1  (or stiffness) for different microcoil configurations and references MicroVention

2  products by part number.

3      152.  Specifically, the MVI Spreadsheet has fifteen tabs dedicated to fifteen

4  different wire thicknesses or "filars."  A wire of a given filar can be formed into many

5  possible coil shapes by choosing the outer diameter of the formed coil and the spacing

6  between each loop of the coil.  For each of the fifteen specifically chosen filars, a list of

7  specifically chosen coil diameters is paired with a list of specifically chosen gap sizes,

8  yielding hundreds of possible coil configurations.  The MVI Spreadsheet computes the

9  k-value for each of these possible coil configurations, which allows MicroVention to

10  compare the softness of various coil configurations prior to manufacture and identify

11  which coil configurations to manufacture and bring to market and which not to.  While

12  the equation for computing k-values may be public knowledge, the specific

13  combinations of wire filars, coil diameters, and gap sizes that MicroVention chose to

14  evaluate are not.

15      153.  In addition, comments have been added to the MVI Spreadsheet that

16  identify specific MicroVention products and part drawings that correspond to twelve of

17  the coil configurations.  Each of the referenced confidential and proprietary

18  MicroVention drawings are among the stolen MicroVention documents Balt produced

19  back to MicroVention in its BALT008 production in the related patent case on August

20  14, 2020.  *See*, *e.g.*, BALT0072887, BALT0073768, BALT0073886, BALT0073931,

21  BALT0073933, BALT0187357.  Although it may have been possible for Balt to

22  calculate the k-values for each of these coils using the dimensions shown in the

23  documents initially stolen from MicroVention, on information and belief, by Individual

24  Defendants Le and Ferrera, the MVI Spreadsheet not only serves up those calculations,

25  but it also provides context by placing specific MicroVention products alongside coil

26  configurations that MicroVention chose not to manufacture and sell.

27      154.  Moreover, the dimensions of the coils contained in MicroVention's

28  controlled drawings are not publicly known and cannot be easily derived from the

-54-

products MicroVention markets and sells given the scale and tolerances involved. Thus, the MVI Spreadsheet contains highly proprietary, trade secrets belonging to MicroVention concerning the criteria and characteristics of the products MicroVention chose to manufacture and market and those it did not. Such information, in the hands of a competitor like Balt, is highly valuable.

155. When Balt produced the three copies of MVI's Spreadsheet, on information and belief, Balt was under the mistaken impression that the MVI Spreadsheet was its own document. Balt designated all three copies as "Confidential – Attorneys' Eyes Only" under the Protective Order entered in the patent case. *See* ECF 27. In fact, Balt has consistently designated as "Confidential – Attorneys' Eyes Only" Balt's own manufacturing procedures, technical drawings, test reports, and other documents of the type described herein as MicroVention proprietary, trade secret and confidential documents. The Protective Order defines "CONFIDENTIAL" Information as information that:

> (a) is regarded by the Disclosing Party as being confidential, personal, private, or proprietary in nature such that it qualifies for protection under Fed. R. Civ. P. 26(c)(1)(G) and/or is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; (b) is protected under the Uniform Trade Secrets Act, California Civil Code section 3426, et. seq., in that such information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use; and (c) is as specified above in the Good Cause Statement.

ECF 27, ¶ 2.3. "CONFIDENTIAL - ATTORNEYS' EYES ONLY" Information is further defined as "Confidential Information or Items that the Designating Party believes in good faith has significant competitive value such that unrestricted disclosure to others would create a substantial risk of serious injury." ECF 27, ¶ 2.4.

156. Although Balt later confirmed by email correspondence in April 2020, that the MVI Spreadsheet was, in fact, a MicroVention document and not a Balt document and that it did not contain any confidential information belonging to Balt, the fact remains that Balt recognized the significant competitive value and the highly sensitive

nature of the information contained in the MVI Spreadsheet when it designated the document CONFIDENTIAL—ATTORNEYS' EYES ONLY under the terms of the parties' Protective Order.

157. Further, the metadata provided by Balt with the document production shows that the three copies of the stolen MVI Spreadsheet were contained in three separate folders at Balt correlating to three different Balt Optima parts or subassemblies: the pusher subassembly, a shaped implant subassembly, and the Optima final assembly. Included in the production of documents from those three folders were multiple revisions of the part drawings and SolidWorks files for each of the three parts. The Balt-provided metadata for the production lists Le as the author of many of these documents and Gong as the author of the most recent revisions to the Part Drawings for all three of the parts. On information and belief, Gong's role as a Balt Research and Development Engineer II is directed by Le who is Balt's Director of Research and Development. While employed at MicroVention, both Le and Gong worked with the V-Trak delivery system that is used to deliver the coils listed in the MVI Spreadsheet.

158. In addition, the Balt-provided metadata shows that the MVI Spreadsheet was authored by MicroVention employee Heath Bowman. Although not included in the Balt-provided metadata, the file properties for the native file indicate that each copy of the MVI Spreadsheet was "Last saved by" "Stephanie Gong" on March 30, 2018. On information and belief, this is the same month and year that Gong began her employment with Balt.

159. On information and belief, Gong, in collaboration with the other Individual Defendants took, without permission and in violation of her confidentiality obligations to MicroVention, the proprietary and confidential MVI Spreadsheet from MicroVention upon her departure from the company. On information and belief, Gong accessed and used the MVI Spreadsheet while employed at Balt in connection with the development of the competitive Optima product.

1

2

   **d.   Le's continued solicitation of confidential MicroVention documents from MicroVention employees and use of the same**

3      160.   As for Individual Defendant Le, on information and belief, his theft of

4  MicroVention trade secrets and other confidential and proprietary documents did not

5  stop upon his departure from MicroVention.   Instead, Defendant Le continued to

6  encourage and solicit the theft of MicroVention trade secrets and confidential and

7  proprietary information by former MicroVention employees upon their departure from

8  MicroVention to join him at Balt.  On information and belief, Defendants Le and Ferrera

9  used the documents they and others stole from MicroVention to develop copycat

10  products and processes and, essentially, to build a competing medical device company

11  by copying MicroVention from the ground up.   MicroVention has uncovered to date,

12  that five hundred twenty-two (522) of the stolen documents produced by Balt—all

13  listing Defendant Le as custodian—were modified on or after November 3, 2011,

14  immediately following Le's departure from MicroVention and coinciding with his

15  arrival at Balt.  Importantly, one hundred seventeen (117) of these stolen documents are

16  SolidWorks drawings for various parts of MicroVention's V-Trak delivery system and

17  identify Le as the individual who made modifications to the MicroVention documents.

18      161.   On information and belief, as many as fifty (50) former MicroVention

19  employees have been employed by Balt, primarily as engineers and product assemblers.

20  On information and belief, Defendants actively solicit and target to hire MicroVention

21  employees with specialized knowledge of MicroVention's products, processes, and

22  procedures, and with the specific intent to capitalize on such knowledge by inducing

23  these employees to breach their confidentiality obligations to their former employer and

24  provide Balt with access to, and use of, MicroVention trade secrets and confidential and

25  proprietary information.  Such unlawful conduct by Defendants is systemic.  By way of

26  example, on August 17, 2019, just six weeks after MicroVention filed its patent lawsuit

27  against Balt, Ferrera, then Balt's Chief Technology Officer, reached out to

28  MicroVention employee Joe Gulachenski via text message, asking, "Who's designing

-57-

catheters at Microvention [sic] now?".  Two days later, after Gulachenski had not replied, Ferrera pressed the issue again, asking, "Are you ignoring me?"

162.   On information and belief, Ferrera left Balt in May 2020 to work with a venture capital firm focused on medical device startup companies in the same neurovascular field as MicroVention and Balt.  On information and belief, substantial risk exists that Ferrera will continue his practice of soliciting, mining, and using stolen MicroVention trade secrets and confidential and proprietary information to benefit himself and the companies in which he either works or has a financial interest.

163.   Given the vast theft of MicroVention trade secrets and confidential and proprietary information by Defendants over a number of years as depicted in over 186,000 pages of stolen documents, MicroVention is certain to uncover further atrocities committed by Defendants resulting in harm to MicroVention.

        **e.**    **Tran's theft of MicroVention trade secrets, the transfer of those trade secrets to Le and Balt, and the use of those trade secrets to benefit Balt**

164.   On information and belief, Individual Defendants Ferrera and Le also used Individual Defendant Tran to mine MicroVention trade secrets and confidential and proprietary information for the benefit of Balt.

165.   On January 18, 2017, only three months before Tran left MicroVention, Le, from his official Balt email address, reached out to Tran at her MicroVention email address saying, "Remember me?" and offering a lunch date to "catch up."  Just five days later, on January 23, 2017, Tran forwarded the first of what would become more than one hundred emails from her MicroVention email address to her personal email address.  The first of these emails was correspondence with a MicroVention supplier that contained detailed information about a piece of machinery used in the manufacture of MicroVention catheters.  On information and belief, over the next three months, Le continued to correspond with Tran, enticed her to leave MicroVention and accept a position with Balt, and encouraged her to steal MicroVention trade secrets and

confidential and proprietary information used in the development of MicroVention catheters on her way out the door.

166.    Unbeknownst to MicroVention, in early February 2017, following Le's initial outreach to Tran, Tran forwarded three more emails from her MicroVention email address to her personal email address.  These emails contained technical information, including dimensions and temperature characteristics, pertaining to a new SOFIA catheter then under development by MicroVention, as well as a discussion with a MicroVention supplier about testing a piece of manufacturing equipment.  At around that same time, Tran added two new contacts to her MicroVention email account—Jake Le and a second former MicroVention employee also employed by Balt.

167.    On March 24, 2017, three weeks before she notified MicroVention that she would be leaving her employment, Tran began gathering highly proprietary documents pertaining to production metrics, cost and labor rates, and work in process (WIP) reports for MicroVention's SOFIA catheters.  Later, on her way out the door, Tran forwarded these same documents from her MicroVention email address to her personal email address.

168.    On April 6, 2017, Tran forwarded to her personal email address quotes MicroVention received from its approved suppliers, for two different pieces of catheter manufacturing equipment MicroVention uses in making its catheter products.

169.    On information and belief, throughout early 2017 and while still employed by MicroVention, Tran shared with Le and others at Balt, the MicroVention trade secrets and confidential and proprietary information she emailed from her MicroVention email account to her personal email address.  On information and belief, Tran did so with the intent that such information be used for, and in connection with, the development of competing Balt products.  And, on information and belief, Balt, Le, and eventually Tran and others at Balt did use these MicroVention trade secrets and confidential information in the development of competing Balt catheter products.

-59-

Evidence of Balt, Le and Tran's use of this misappropriated information is in the possession of Balt, Le and Tran.

170.   On April 17, 2017, Tran tendered her resignation to MicroVention via email with an attached letter explaining her departure to her supervisor.  In her letter, Tran expressed "sadness" to be leaving MicroVention where she had "worked with such a fantastic and supportive team" and gained "invaluable" experiences and relationships. Tran paints the decision as a difficult one, saying, "I was thinking about this for a while and finally made my decision today."  However, Tran had been doing much more than just thinking about leaving MicroVention.  On information and belief, by the time she tendered her resignation, Tran, with the encouragement of Le, had been stealing MicroVention documents for weeks.  In her resignation letter, Tran is vague about her next steps, speaking only of "new challenging opportunities and adventure."  Tran does not mention that her new and challenging opportunity will be copying MicroVention's catheter products for her new employer, Balt.

171.   As for Tran's final two weeks at MicroVention, her letter states that her "main concerns now are to wrap up and transfer multiple projects that I am involved with and do whatever I can to help turn my responsibilities over in a smooth manner." Instead, Tran spent her final two weeks at MicroVention pilfering MicroVention trade secrets and confidential information, forwarding more than one hundred separate emails and more than one hundred attached documents to her personal email address.  These forwarded emails and documents included quotes from approved suppliers for specific materials and quantities; quotes from suppliers for a variety of catheter manufacturing and testing equipment and machinery; purchase orders for materials, parts, and equipment purchased by MicroVention; contact information for a slew of MicroVention suppliers; internal discussions about part and product dimensions; internal discussions about the suitability of certain materials for use in manufacturing catheters; part and product drawings; testing and regulatory compliance information pertaining to MicroVention catheters; internal discussions about how to respond to specific questions

-60-

posed by the FDA during the approval process; conversations about sending product samples to physicians for testing; future projects that might be undertaken at MicroVention; upgrades to MicroVention's equipment and facilities; and manufacturing and production data, including work in process (WIP) reports, costs, and labor and overhead rates. Tran's theft was keenly focused on documents pertaining to MicroVention's catheter products and, specifically, the SOFIA catheter. The contents of the emails and documents misappropriated by Tran clearly contain MicroVention trade secrets. MicroVention attaches as Exhibit Q, a table setting forth a description of the emails and documents forwarded by Tran, without MicroVention's permission or knowledge, from her MicroVention email address to her personal email address.

172. Within ten minutes of Tran submitting her resignation letter on April 17, 2017, MicroVention management responded with urgent pleas and enticements to retain Tran. Tran did not reply for over 48 hours. Instead, on information and belief, Tran spent that next 48-hour period of time scouring her own MicroVention email account, for documents and information that could be useful to her work at Balt. Tran forwarded to her personal email account, emails and documents spanning every year between 2010 and 2017. By the time Tran got around to rejecting MicroVention's attempts to retain her two days later, she had forwarded an additional 60 emails with attachments containing MicroVention trade secrets and other confidential information to her personal email address. On information and belief, Tran shared all of the stolen information with Le, Balt and others.

173. Tran's email history on April 19, 2017, reveals the depth of her deception. Tran spent that morning forwarding MicroVention's trade secrets and other confidential information to her personal email address before finally replying to MicroVention management just before noon, rejecting their "very generous" retention offer stating, "It is not about the company, people or money. MicroVention is my second home, . . . [b]ut I feel that it is time for me to learn new things at [a] new place, new environment and new people." Tran also attempted to leave the door open by stating, "If I won't

success [sic] and MicroVention door still open, I will come back," adding a smile emoji. After sending her reply, Tran forwarded an email containing a quote and discussion with a MicroVention vendor pertaining to pricing for catheter testing equipment to her personal email address.

174.   Within 30 minutes of receiving Tran's email on April 19th, MicroVention management responded with, "What are you doing next?"  Instead of answering that question, Tran spent the next two hours forwarding eleven more emails containing MicroVention trade secrets and confidential information to her personal email address. When Tran finally responded she was evasive, stating only, "I need to take vacation to refresh my mind and energy, and learn how to drink Margaritas," ending with an angel emoji.   Tran then immediately resumed her theft of MicroVention documents— forwarding to her personal email address a MicroVention email thread containing a quote for the plasma equipment used by MicroVention in the coating of its catheter products.

175.   On information and belief, Tran shared the information and documentation she sent from MicroVention to her personal email account with Le, and others at Balt, for use in the development of Balt catheter products and in the sourcing of materials and equipment for use in connection with the same.  Further, on information and belief, Le, Tran and Balt have used these MicroVention trade secrets and confidential information stolen by Tran in the research, development and testing of competitive catheter products and processes related to such products and in the sourcing of equipment for use in connection with the same.  Evidence of Balt, Le and Tran's use of this misappropriated information from MicroVention is in the possession of Balt, Le and Tran.

176.   The April 19, 2017, email correspondence between Tran and MicroVention management concludes with MicroVention asking whether Tran would "consider working part time as a consultant" to MicroVention.  Tran deflects instead of providing a direct response stating, "Let me take vacation first and will get back to you

-62-

about part time job." Tran had spent the entire afternoon alternating between playing nice with MicroVention (and emphasizing that her next step was vacation) and stealing MicroVention trade secrets and confidential information by forwarding, without permission, such documents and information to her personal email address. On information and belief, Tran continued to pilfer MicroVention trade secrets and confidential information over the next two weeks up until the date of her departure on April 28, 2017.

177. On April 27, 2017, despite clear knowledge that she had taken MicroVention trade secrets and confidential and proprietary information from the company, and, on information and belief, with the intent to use the same at her new job with Balt, Tran signed both the Termination Certificate and the Separation Checklist presented to her by MicroVention at her exit interview. On information and belief, Tran lied to MicroVention when she certified that she had returned all MicroVention documents in her possession. And, despite acknowledging her ongoing obligations to keep MicroVention information confidential, on information and belief, she clearly had no intention of doing so. Adding insult to injury, Tran forwarded that same day, fourteen more emails containing MicroVention trade secrets and confidential information to her personal email account.

178. And finally, MicroVention uncovered that Tran, on her last day of employment with MicroVention on April 28, 2017, stole from the company and sent to her personal email account, documentation containing MicroVention's design plans for a model aneurysm in which to test its catheters.

179. Despite Tran's claims she was destined for adventure, vacation, and margaritas, Tran started work at Balt on May 1, 2017, three days after her departure from MicroVention.

180. On information and belief, Tran used the trade secrets and confidential information she took from MicroVention, as set forth herein, to jump start Balt's development of competing catheter products and the processes necessarily used in

-63-

connection with such products including, but not limited to, MicroVention's highly proprietary catheter coating process.  On information and belief, Tran, Le and others at Balt have mined the treasure trove of confidential information and documentation that Tran brought with her from MicroVention to Balt, for use in the research, development, manufacturing, and testing of Balt catheter products and in the procurement of materials, components, and equipment necessary to the same.  Documentation supporting such use is in the possession of Balt, Le and Tran.

181.  As with other former employees of MicroVention, on information and belief, Tran also continues to solicit and encourage the theft of MicroVention trade secrets and confidential and proprietary information by others with access to such information.  On information and belief, Tran does so with knowledge that these individuals owe obligations of confidentiality to MicroVention and that in doing so she is encouraging the breach of those confidentiality obligations.  On information and belief, Tran is using the MicroVention trade secrets and confidential information she obtains through these individuals for her personal benefit and for the benefit of Balt. Documentation supporting such solicitation and encouragement is in the possession of Balt and Tran.

182.  On information and belief, Balt is aware of Tran's and the other Individual Defendants' theft and use of MicroVention's trade secrets and confidential information in connection with their work for Balt.  Balt produced evidence of Defendants' use of MicroVention's trade secrets in discovery in the related patent case pending before this Court.

183.  MicroVention products like the SOFIA are considered to be the most technologically advanced stroke treatment catheters available.  As such, the trade secrets and confidential information that Tran stole from MicroVention, disclosed to the Individual Defendants and others at Balt, and is using to develop a competing line of catheter products, is of enormous value to Balt in that it allows Balt to obtain a

substantial head start in the development of its catheter products while at the same time saving on the substantial time, talent, and resources necessary to develop such products.

### FIRST CAUSE OF ACTION

### (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act – 18 U.S.C. § 1836, *et seq.*- Against All Defendants)

184. MicroVention realleges and incorporates by reference paragraphs 1 through 183 above as though fully set forth herein.

185. MicroVention owns and possesses trade secrets as specifically alleged in this Amended Complaint. These trade secrets include a robust system of policies, processes, and procedures prepared by MicroVention for use in its business. This includes, among other things, an interconnected library of controlled documents in which MicroVention records, in detail, its current projects, future plans, product designs, recipes, procedures, verification methods, test results, and other highly confidential trade secrets. It also includes a sophisticated knowledge management system containing, among other things, regulatory compliance information, customer feedback, and competitive marketing, sales, and other sensitive business information.

186. These trade secrets are reflected in MicroVention's Marketing Specifications, Design Specifications, Part Drawings, Manufacturing Procedures, Test Methods, Risk Assessment Plans, Test Reports, Test Data, Build Records, Equipment Specifications, Tool Drawings, Approved Supplier Lists, Customer Needs Memorandums, Consulting Agreements, Receiving Specifications, Regulatory Filing Checklists, Quality Assurance Procedures and Specifications, Preventative Maintenance documents and other strategic marketing, financial and sales documents, among other confidential company documents.

187. MicroVention has developed its trade secrets over the course of many years, through a substantial financial investment of hundreds of millions of dollars, as well as through a significant investment in time, talent, and other resources. MicroVention's trade secrets and other proprietary technology allow it to efficiently

and effectively design, produce, and bring to market cutting edge medical device products for the treatment of neurovascular diseases in what is a highly competitive industry.

188.   MicroVention's trade secrets are not generally known and cannot be readily ascertained by others.  MicroVention derives substantial economic value from its trade secrets.  This economic value results precisely because its trade secrets are not generally known to the public or to others who could obtain economic value or a competitive advantage from using them.  MicroVention's trade secrets are kept secret because they provide MicroVention with a competitive advantage in the marketplace.

189.   MicroVention undertakes extensive efforts to protect and maintain the secrecy of its trade secrets.  As set forth herein, such efforts include, but are not limited to, maintaining controlled documents in password protected electronic databases with restricted access, using security software and audits to protect technology resources, using confidentiality legends on electronic and printed documents, maintaining printed documents in use in manufacturing processes and on production lines under lock and key, and restricting physical access to proprietary equipment and the computers that control the equipment through the use of passwords and to specified employees. MicroVention employees also receive instruction and training on the importance of maintaining the confidentiality of MicroVention trade secrets and are required to sign and abide by the Confidentiality Agreement that all must sign as a condition of employment.  Vendors, physicians, suppliers, and others working with MicroVention are required to sign NDAs.  MicroVention facilities are closed to the public.  Employees must scan their badges to enter MicroVention buildings, and security guards posted at the front entrance and on roving patrol require visitors to be escorted by an employee. Photography, video recordings, and cell phone use are restricted and/or prohibited.

190.   Despite MicroVention's extensive efforts to maintain the secrecy of its trade secrets, Defendants, and each of them, individually and/or in collaboration with one another, acquired through improper means, MicroVention's trade secrets.

Defendants misappropriated MicroVention's trade secrets through theft and/or by acquiring MicroVention's trade secrets from individuals whom Defendants knew, or had reason to know, owed a duty to MicroVention to maintain the confidentiality of this information.

191.   Defendants are currently using, and will continue to use, MicroVention's trade secrets for their own benefit and/or for the benefit of Balt both in the operation of Balt's business and in the design and development of Balt's medical device products. The trade secrets of MicroVention relate to the medical products of MicroVention and Balt that are used in, and intended for use in, interstate and foreign commerce within the meaning of 18 U.S.C. § 1836(b)(1).

192.   Defendants' acquisition and use of MicroVention's trade secrets has caused, and will continue to cause, great harm to MicroVention.  Such acquisition and use has provided Defendants with an unfair competitive advantage by, among other things:  (1) allowing Defendants to forgo the substantial investment of time and resources necessary to develop the trade secret processes and procedures, an investment that MicroVention made; (2) permitting Defendants to more quickly design, develop and bring to market competitive products through the use of MicroVention's trade secrets; and (3) allowing Defendants to build an entire business with competitive product lines based on technology and trade secrets stolen from MicroVention—a business which, within 5 years, was sold to an international conglomerate for over $42M.

193.   Each of the Individual Defendants, Ferrera, Le, Katayama, Gong and Tran had access to MicroVention's trade secrets and other confidential and proprietary information during their employment with MicroVention.  Despite the extensive efforts undertaken by MicroVention to protect its trade secrets, and its other confidential and proprietary information, and in violation of their contractual and legal obligations to MicroVention, each of these former employees took and/or facilitated and encouraged the theft, misappropriation and use of MicroVention's trade secrets.  As a result, each

-67-

1    of the Individual Defendants are independently and collectively responsible for the

2    harm such actions have caused to MicroVention.

3        194.   Further, given the executive-level positions held by Ferrera and Le while

4    with MicroVention, without question both understood and appreciated the nature and

5    value of the intellectual property they misappropriated from MicroVention and used for

6    their own benefit and for the benefit of Balt.  Moreover, given the executive-level

7    management positions held by Ferrera and Le at Balt, their actions and knowledge are

8    implied and imputed to Balt.  Accordingly, Ferrera, Le and Balt's misappropriation and

9    use of MicroVention's trade secrets was clearly willful and malicious.

10       195.   Katayama and Gong's misappropriation of MicroVention trade secrets and

11   confidential and proprietary information was likewise willful and malicious.  Both

12   Katayama and Gong were aware of their obligations to maintain the confidentiality of

13   MicroVention trade secrets.  Despite acknowledging these obligations and certifying

14   that she returned all MicroVention documents, on information and belief, Defendant

15   Gong took MicroVention proprietary documents with her to Balt and used those

16   documents in her engineering work for Balt.  Katayama refused to certify his return of

17   all MicroVention documents and instead, on information and belief, took trade secrets

18   and confidential information with him to Balt for use in his work with Balt.

19   Accordingly, Katayama and Gong's misappropriation and use of MicroVention trade

20   secrets was willful and malicious.

21       196.   Given the senior positions held by Tran while with MicroVention, without

22   question she understood and appreciated the nature and value of the intellectual property

23   she misappropriated from MicroVention and used for her own benefit and for the benefit

24   of Balt.   Tran was aware of her obligations to maintain the confidentiality of

25   MicroVention trade secrets.  Despite acknowledging these obligations and certifying

26   that she returned all MicroVention documents, on information and belief, Defendant

27   Tran took MicroVention trade secrets and proprietary documents with her to Balt and

28   used those documents in her work for Balt.   Moreover, given the executive-level

-68-

management positions held by Tran at Balt, her actions and knowledge are implied and imputed to Balt.  Accordingly, Tran's misappropriation and use of MicroVention trade secrets was willful and malicious.

197.   As a proximate result of their wrongful conduct, Defendants remain in possession of stolen MicroVention trade secrets and confidential and proprietary information.  Absent Court intervention, Defendants' conduct in misappropriating MicroVention's trade secrets, and other confidential and proprietary information, will continue and will result in great and irreparable harm to MicroVention's business. Because MicroVention has no adequate remedy at law for the injuries it is currently suffering, and will continue to suffer, as a result of Defendants' unlawful conduct, MicroVention seeks both preliminary and permanent injunctive relief to recover, preserve and protect its trade secrets and other legitimate business interests from their ongoing misappropriation and use by Defendants. *See, e.g.*, 18 U.S.C. § 1836(b)(3)(A) (authorization to grant injunctive relief).

198.   As a further direct and proximate result of the acts of Defendants as alleged herein, MicroVention has suffered, and will continue to suffer, damages in the amount of the actual losses caused by Defendants' misappropriation of trade secrets. *See, e.g.*, 18 U.S.C. § 1836(b)(3)(B)(i)(I) (authorization to award damages for actual loss caused by the misappropriation). In addition, 18 U.S.C. § 1836(b)(3)(B)(i)(II) permits MicroVention to recover for the unjust enrichment caused by Defendants' misappropriation to the extent such unjust enrichment is not addressed in computing damages for actual loss.  In the event Defendants have caused harm for which neither actual damages nor unjust enrichment can be established, 18 U.S.C. § 1836(b)(3)(B)(ii) entitles MicroVention to the payment of a reasonable royalty as compensation for such harm, and in an amount to be determined.  While the exact amount of damages suffered by MicroVention resulting from Defendants' misconduct will be proven at trial, on information and belief, such damages are likely to exceed one hundred million dollars.

199.   Defendants' misappropriation of MicroVention's trade secrets has been knowing, willful, malicious, fraudulent, and oppressive.  Given the nature and severity of Defendants' intentional, willful, and malicious misconduct, injunctive or other equitable relief will be inadequate to prevent Defendants from engaging in future misconduct.  Accordingly, MicroVention seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of MicroVention's trade secrets and confidential or proprietary information and documentation in the possession, custody, or control of any of the Defendants in order to recover and protect MicroVention's trade secrets and other legitimate business information.

200.   In light of the fact that Defendants willfully and maliciously misappropriated MicroVention's trade secrets and other proprietary and confidential information, MicroVention seeks recovery of its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D) and exemplary damages to the fullest extent permissible pursuant to 18 U.S.C. § 1836(b)(3)(C).

## SECOND CAUSE OF ACTION

**(Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act ("CUTSA") – Cal. Civ. Code § 3426, *et seq.* - Against All Defendants)**

201.   MicroVention realleges and incorporates by reference paragraphs 1 through 200 above as though fully set forth herein.

202.   At all times relevant herein, MicroVention owned and was in possession of its trade secrets as specified herein and as defined by California Civil Code Section 3426.1(d).  As set forth herein, these trade secrets include a robust information system of policies, processes, and procedures prepared by MicroVention for use in its business. It includes, among other things, an interconnected library of controlled documents in which MicroVention records, in detail, its current projects, future plans, product designs, recipes, procedures, verification methods, test results, and other highly confidential trade secrets.  It also includes a sophisticated knowledge management

system containing, among other things, regulatory compliance information, customer feedback, and competitive marketing, sales, and other sensitive business information.

203.   These trade secrets are reflected in MicroVention's Marketing Specifications, Design Specifications, Part Drawings, Manufacturing Procedures, Test Methods, Risk Assessment Plans, Receiving Specifications, Test Reports, Test Data, Build Records, Equipment Specifications, Tool Drawings, Approved Supplier Lists, Customer Needs Memorandums, Consulting Agreements, Regulatory Filing Checklists, Quality Assurance Procedures and Specifications, Preventive Maintenance documents and other strategic marketing, financial and sales documents, among other confidential company documents.

204.   MicroVention developed its trade secrets over the course of many years, through a substantial financial investment of hundreds of millions of dollars, as well as through a significant investment in time, talent, and other resources.  MicroVention's trade secrets and other proprietary technology allow it to efficiently and effectively design, produce, and bring to market cutting edge medical products for the treatment of neurovascular diseases in what is a highly competitive industry.

205.   MicroVention's trade secrets are not generally known and cannot be readily ascertained by others.  MicroVention derives substantial economic value from its trade secrets.  This economic value results precisely because its trade secrets are not generally known to the public or to others who could obtain economic value or a competitive advantage from using them.  MicroVention's trade secrets are kept secret because they provide MicroVention with a competitive advantage in the marketplace.

206.   MicroVention undertakes extensive efforts to protect and maintain the secrecy of its trade secrets.  As set forth herein, such efforts include, but are not limited to, maintaining controlled documents in password protected electronic databases with restricted access, using security software and audits to protect technology resources, using confidentiality legends on electronic and printed documents, maintaining printed documents in use in manufacturing processes and on  production lines under lock and

key, and restricting physical access to proprietary equipment through the use of passwords and to specified employees. MicroVention employees also receive instruction and training on the importance of maintaining the confidentiality of MicroVention trade secrets and are required to sign and abide by the Confidentiality Agreement that all must sign as a condition of employment. Vendors, physicians, suppliers, and others working with MicroVention are required to sign NDAs. MicroVention facilities are closed to the public. Employees must scan their badges to enter MicroVention buildings, and security guards posted at the front entrance and on roving patrol require visitors to be escorted by an employee. Photography, video recordings, and cell phone use are restricted and/or prohibited.

207. Despite MicroVention's extensive efforts to maintain the secrecy of its trade secrets, Defendants, and each of them, individually and/or in collaboration with one another, acquired, through improper means, MicroVention's trade secrets in violation of California Civil Code Sections 3426.1(b). Defendants misappropriated MicroVention's trade secrets through theft and/or by knowingly acquiring MicroVention's trade secrets from individuals whom Defendants knew, or had reason to know, owed a duty to MicroVention to maintain the confidentiality of its trade secrets and other confidential and proprietary information.

208. Defendants are currently using, and will continue to use, MicroVention's trade secrets for their own benefit and/or for the benefit of Balt both in the operation of Balt's business and in the design and development of Balt's medical products.

209. Defendants' acquisition and use of MicroVention's trade secrets has caused, and will continue to cause, great harm to MicroVention. Such acquisition and use has provided Defendants with an unfair competitive advantage by, among other things: (1) allowing Defendants to forgo the substantial investment of time and resources necessary to develop the trade secret products, processes and procedures, an investment that MicroVention made; (2) permitting Defendants to more quickly design, develop and bring to market competitive products through the use of MicroVention's

trade secrets; and (3) allowing Defendants to build an entire business with competitive product lines based on technology and trade secrets stolen from MicroVention—a business which, within 5 years, was sold to an international conglomerate for over $42M.

210.   Each of the Individual Defendants, Ferrera, Le, Katayama, Gong and Tran had access to MicroVention's trade secrets and other confidential and proprietary information during their employment with MicroVention.  Despite the extensive efforts undertaken by MicroVention to protect its trade secrets, and its other confidential and proprietary information, and in violation of their contractual and legal obligations to MicroVention, each of these former employees took and/or facilitated and encouraged the theft, misappropriation and use of MicroVention's trade secrets.  As a result, each of the Individual Defendants are independently and collectively responsible for the harm such actions have caused to MicroVention.

211.   Further, given the executive level positions held by Ferrera and Le while with MicroVention, without question both understood and appreciated the nature and value of the intellectual property they misappropriated from MicroVention and used for their own benefit and for the benefit of Balt.  Moreover, given the executive-level management positions held by Ferrera and Le at Balt, their actions and knowledge are implied and imputed to Balt.  Accordingly, Ferrera, Le and Balt's misappropriation and use of MicroVention's trade secrets was clearly willful and malicious.

212.   Katayama and Gong's misappropriation of MicroVention trade secrets and confidential and proprietary information was likewise willful and malicious.  Both Katayama and Gong were aware of their obligations to maintain the confidentiality of MicroVention trade secrets.  Despite acknowledging these obligations and certifying that she returned all MicroVention documents, on information and belief, Defendant Gong took MicroVention proprietary documents with her to Balt and used these documents in her engineering work for Balt.  Katayama refused to certify his return of all MicroVention documents and instead, on information and belief, took trade secrets

-73-

1     and confidential information with him to Balt for use in his work for Balt. Accordingly,

2     Katayama and Gong's misappropriation and use of MicroVention trade secrets was

3     willful and malicious.

4         213. Given the senior positions held by Tran while with MicroVention, without

5     question she understood and appreciated the nature and value of the intellectual property

6     she misappropriated from MicroVention and used for her own benefit and for the benefit

7     of Balt. Tran was aware of her obligations to maintain the confidentiality of

8     MicroVention trade secrets. Despite acknowledging these obligations and certifying

9     that she returned all MicroVention documents, on information and belief, Defendant

10    Tran took MicroVention trade secrets and other proprietary documents with her to Balt

11    and used those documents in her work for Balt. Moreover, given the executive-level

12    management positions held by Tran at Balt, her actions and knowledge are implied and

13    imputed to Balt. Accordingly, Tran's misappropriation and use of MicroVention trade

14    secrets was willful and malicious.

15        214. As a proximate result of their wrongful conduct, Defendants remain in

16    possession of stolen MicroVention trade secrets and confidential and proprietary

17    information. Absent Court intervention, Defendants' conduct in misappropriating

18    MicroVention's trade secrets, and other confidential and proprietary information, will

19    continue and will result in great and irreparable harm to MicroVention's business.

20    Because MicroVention has no adequate remedy at law for the injuries it is currently

21    suffering, and will continue to suffer, as a result of Defendants' unlawful conduct,

22    MicroVention seeks both preliminary and permanent injunctive relief to recover,

23    preserve and protect its trade secrets and other legitimate business interests from their

24    ongoing misappropriation and use by Defendants. *See, e.g.*, California Civil Code §

25    3426.2 (authorization to grant injunctive relief).

26        215. As a further direct and proximate result of the acts of Defendants as alleged

27    herein, MicroVention has suffered, and will continue to suffer, damages in the amount

28    of the actual losses caused by Defendants' misappropriation of trade secrets. *See, e.g.*,

California Civil Code § 3426.3(a) (authorization to award damages for actual loss caused by the misappropriation). In addition, California Civil Code § 3426.3(a) permits MicroVention to recover for the unjust enrichment caused by Defendants' misappropriation to the extent such unjust enrichment is not accounted for in calculating damages for actual loss. In the event Defendants have caused harm for which neither actual damages nor unjust enrichment can be established, California Civil Code § 3426.3(b) entitles MicroVention to the payment of a reasonable royalty as compensation for such harm, and in an amount to be determined. While the exact amount of damages suffered by MicroVention resulting from Defendants' misconduct will be proven at trial, on information and belief, such damages are likely to exceed one hundred million dollars.

216. Given Defendants' willful and malicious misappropriation of MicroVention's trade secrets and other proprietary and confidential information, MicroVention seeks recovery of its reasonable attorneys' fees and costs pursuant to California Civil Code § 3426.4 and exemplary damages to the fullest extent permissible pursuant to California Civil Code § 3426.3(c).

## THIRD CAUSE OF ACTION

### (Breach of Contract Against All Individual Defendants)

217. MicroVention realleges and incorporates by reference paragraphs 1 through 216 above as though fully set forth herein.

218. As specifically alleged in detail above, each of the Individual Defendants breached the terms of their Confidentiality Agreement with their former employer by, among other things, failing to keep confidential and to not disclose or make use of MicroVention's trade secrets and other highly confidential and proprietary information of the Company including, but not limited to, information pertaining to MicroVention's products, processes, know-how, designs, specifications, formulas, data, inventions, customer needs memorandums, approved supplier lists and other trade secrets and confidential and proprietary information of the Company as set forth herein.

-75-

219.   Under the terms of the Confidentiality Agreement, the Individual Defendants also agreed not to deliver, reproduce or in any way allow any of MicroVention's trade secrets or other confidential or proprietary information to be delivered to, or used by, third parties without the specific consent of a duly authorized representative of MicroVention.   The Individual Defendants, and each of them, breached this provision of the Confidentiality Agreement as well.

220.   Further, the Confidentiality Agreement signed by each of the Individual Defendants required the Defendants to return to MicroVention, upon the termination of their employment, all information and materials in their possession that belonged to MicroVention.  The Individual Defendants, and each of them, breached their Agreement with MicroVention by failing to promptly surrender and deliver to MicroVention all records, materials, equipment, drawings, specifications, documents, and data, among other things, belonging to MicroVention and instead, by deliberately taking such documents and materials with them and using them for the benefit of their new company (Blockade) and/or employer (Blockade/Balt).

221.   Each of the Individual Defendants, with the exception of Katayama, upon terminating their employment with MicroVention, also signed a "Termination Certificate" certifying that they did not have in their possession, nor had they failed to return, any records, documents computer disks, tapes or printouts, sound recordings, customer lists, photographs, data specifications, drawings, blueprints, reproductions, sketches, notes reports, proposals, or copies of them, or other documents or materials, equipment, samples, prototypes, models or other property belonging to MicroVention. Despite providing the Company with such certifications, the Individual Defendants, and each of them, took with them upon their departure, MicroVention's trade secrets and other highly confidential and proprietary information of the Company in violation of their Confidentiality Agreement and the certifications provided pursuant to the Termination Certificate.

222.   As for Defendant Katayama, his refusal to sign the Termination Certificate upon his departure from MicroVention is also a breach of the Confidentiality Agreement he executed with the Company.

223.   Further, upon their separation from MicroVention, each of the Individual Defendants, with the exception of Katayama, signed a Separation Checklist verifying the return of MicroVention proprietary information, files, memoranda, documents, records, copies of software and equipment to MicroVention and reaffirming their understanding of their confidentiality obligations to MicroVention as set forth in the Confidentiality Agreement.   Again, despite their attestations, these Individual Defendants breached their obligations to MicroVention by taking and/or failing to return such confidential and proprietary information to the Company and by using it for the benefit of their new company (Blockade) and/or employer (Blockade/Balt).

224.   Defendant Katayama's refusal to sign the Separation Checklist verifying the return of MicroVention proprietary information and reaffirming his understanding of his confidentiality obligations to MicroVention as set forth in the Confidentiality Agreement, his taking of and/or failing to return to MicroVention its confidential and proprietary information, and his use of MicroVention's confidential and proprietary information for the benefit of his new employer, Balt, is also a breach of his obligations to MicroVention under the Confidentiality Agreement.

225.   MicroVention has performed all covenants, conditions, and promises required to be performed by it under the terms of the Confidentiality Agreement.

226.   As a direct and proximate cause of the wrongful acts of the Individual Defendants as alleged herein, MicroVention has suffered, and continues to suffer, damages.   The Individual Defendants are liable to MicroVention for damages, interest, costs, and expenses, and any other amounts that MicroVention may be entitled to in an amount to be proven at the time of trial.

## PRAYER FOR RELIEF

**WHEREFORE**, MicroVention requests judgment in its favor and against Defendants, jointly and severally, as follows:

1.     On all claims for the relief herein alleged;

2.     For preliminary and permanent injunctive relief enjoining Defendants, their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from further misappropriating and/or using MicroVention's trade secrets and confidential and proprietary technical and business information;

3.     For an Order seizing all MicroVention trade secrets and confidential and proprietary technical or business information in the possession, custody, or control of any Defendant in order to recover and protect such information as permitted by 18 U.S.C. § 1836(b)(2);

4.     For an Order requiring Defendants to pay MicroVention the compensatory damages to which it is entitled, with pre-judgment and post-judgment interest at the highest rate allowable by law;

5.     For an Order requiring Defendants to disgorge all profits unjustly obtained through the use of MicroVention's trade secrets and to pay those profits to MicroVention, with interest at the highest rate allowable by law;

6.     For an Order requiring Defendants to pay MicroVention exemplary damages including, but not limited to, double the amount of compensatory damages awarded on account of Defendants' intentional, willful, and malicious misappropriation of MicroVention's trade secrets;

7.     For an Order requiring Defendants to pay MicroVention's reasonable attorneys' fees and allowable court costs and expenses; and

8.     For an Order granting MicroVention all other and further relief to which it is entitled at law or in equity, and as the Court deems just and proper.

1    Dated:  September 29, 2021

2                                              EVAN FINKEL
                                              CALLIE A. BJURSTROM
3                                              MICHAEL S. HORIKAWA
                                              MICHELLE A. HERRERA
4                                              CHAZ M. HALES
                                              CHLOE STEPNEY
5                                              PILLSBURY WINTHROP SHAW PITTMAN LLP

6                                              By: /s/ Callie A. Bjurstrom
7                                                 Callie A. Bjurstrom
                                                  Attorneys for Plaintiff
8                                                 MICROVENTION, INC.

9                          **<u>DEMAND FOR JURY TRIAL</u>**

10        Plaintiff MicroVention, Inc. hereby demands a jury trial, as provided by Rule 38

11   of the Federal Rules of Civil Procedure, on all claims that are triable to a jury.

12   Dated:  September 29, 2021

13                                             EVAN FINKEL
                                              CALLIE A. BJURSTROM
14                                             MICHAEL S. HORIKAWA
                                              MICHELLE A. HERRERA
15                                             CHAZ M. HALES
                                              CHLOE STEPNEY
16                                             PILLSBURY WINTHROP SHAW PITTMAN LLP

17
                                              By: /s/ Callie A. Bjurstrom
18                                                Callie A. Bjurstrom
                                                  Attorneys for Plaintiff
19                                                MICROVENTION, INC.

20

21

22

23

24

25

26

27

28

-79-

4816-7657-5985.v2